**Booker GOLDSBY et al., Plaintiffs,**

v.

**Sheriff William Kenneth CARNES et al., Defendants.**

**Civ. A. No. 20122–1.**

United States District Court,
W. D. Missouri, W. D.

Jan. 3, 1973.

Appendix Feb. 8, 1973.

Allen M. Ressler, Ronald L. Roseman, Legal Aid, Kansas City, Mo., for plaintiffs.

Thomas J. Walsh, Lee's Summit, Mo., for Sheriff Carnes.

Herbert M., Kohn, Kansas City, Mo., County Counselor for Jackson County, and Tom J. Helms, Asst. County Counselor, for Jackson County.

## MEMORANDUM OPINION AND ORDER

JOHN W. OLIVER, District Judge.

Counsel for all parties have presented and we have entered a consent judgment in this Section 1983, Title 42, United States Code, case involving the Jackson County Jail. Because of the assistance this case may render other courts dealing with questions similar to those presented in this case, we believe it appropriate to write this memorandum opinion and to direct publication of the consent judgment and the rules and regulations handbook for the Jackson County Jail which is a part of that judgment.

### I.

The statute which vested this Court with jurisdiction over this case was passed by the Congress over 100 years ago. Until the Supreme Court of the United States decided Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and Cooper v. Pate, 378 U.S. 546, 83 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), however, the jurisdiction vested by § 1983, Title 42, United States Code, was infrequently invoked in cases · involving correctional institutions.

Civil rights cases by prisoners confined in state or federal correctional institutions were so few in number that they were not even separately listed by the Administrative Office of the United States Courts until 1966. From 1962 until 1966 those cases were included in a general category of other cases. In 1962, the first year we were on the bench, those cases, even when added to all state prisoner habeas corpus and all other petitions for federal relief, amounted to less than 3,000 cases throughout the entire federal court system.

The increase in prisoner cases in the past ten years, although largely unnoticed by the public media, and therefore the public, has been explosive. The current 1972 report of the Administrative Office of the United States Courts shows that 16,267 prisoner petitions were filed in federal courts last year. That figure is over 17 percent of the total number of all civil cases (96,173) filed during 1972 in all federal courts. This means that approximately every sixth case filed on the civil side of all federal courts in the country is filed by a prisoner in custody of some correctional institution. Because a high percentage of prisoner cases is appealed, the impact of these cases on the entire federal judicial system extends to all ten Courts of Appeals and to the Supreme Court of the United States itself.

One of the many difficulties in this new and expanding area of law lies in the fact that what is sometimes called the correctional system of the United States is not at all a part of a single or unified system of administration of criminal justice; it is an extremely diverse and fragmented group of separate and virtually independent number of prisons, reform schools, jails, and other detention facilities. Litigation concerning the Jackson County Jail, for example, has only precedent value in regard to the conditions of confinement which may exist in any other jail in the United States. The Supreme Court of the United States has not yet directly decided a case in which national standards have been articulated. The law is therefore in a state of relatively rapid development in the lower courts throughout the United States.

Another problem presented by prisoner litigation is the fact that, generally speaking, the general public is both uninformed and apparently disinterested in the real problems involved in regard to the control and rehabilitation of criminal offenders. The quite direct relationship between how corrections are actually administered and what is called crime on the streets is apparently disregarded or ignored. The Task Force Report on Corrections of the President's Commission on Law Enforcement and Administration of Justice (1967), p. 1, aptly stated that "Corrections remains a world almost unknown to law-abiding citizens,

and even those within it often know only their particular corner." But prisoner cases are not going to go away; indeed, they are destined to continue to increase in volume until and unless correctional institutions recognize that federally protected constitutional rights may not be ignored.

A little over one hundred years ago the Supreme Court of Virginia stated in Ruffin v. Commonwealth, 62 Va. (21 Grath) 790, 792 (1871), that during the time a person was in criminal custody he was to be legally considered as "a slave of the State" and that, "as a consequence of his crime, [he] not only forfeited his liberty, but all his personal rights." The significant and substantial change in legal view induced by proper recognition of the federal constitutional questions involved is illustrated by Chief Judge Matthes' statement in Courtney v. Bishop, (8 Cir., 1969) 409 F.2d 1185 at 1187. After noting that "lawful incarceration necessarily operates to deprive a prisoner of certain rights and privileges", he added that it was now well settled that "a convict, however, does not lose all of his civil rights—for those that are fundamental follow him, with appropriate limitations, through the prison gate, and the walls do not foreclose his access to the courts to protect those rights."

Mr. Justice (then Judge) Blackmun noted in another relatively recent case, Sharp v. Sigler, (8 Cir., 1969) 408 F.2d 966, at 970, that in regard to federally protected constitutional rights, "[t]hese precepts do not stop short in their application at a prison's doors." In light of that settled law it is clear that prisoner cases will continue to be filed. It is obvious that the District Courts of the United States are under duty to apply the law as stated in the illustrative cases from which we just quoted.

## II.

Because the sentences of prisoners confined in penitentiaries are longer, civil rights litigation has tended to concentrate in cases involving those institutions rather than jails. Approximately five years ago this Court tried a series of prisoner cases involving the Missouri Penitentiary at Jefferson City. Those cases, as did this case, involved alleged violations of particular prisoner's rights in regard to freedom of religion, interference with the right of free speech as it related to correspondence with persons outside the prison, violations of access to courts, violations of the constitutional prohibition against cruel and unusual punishment, and denial of adequate medical treatment. Typical of prisoner litigation generally, the preparation and trial of those cases required the Missouri Department of Corrections to review, revise, and to put in writing the rules and regulations applicable to prisoners in the Missouri Penitentiary.

In Cupp v. Swenson, (W.D.Mo., 1969) 288 F.Supp. 1, 3, one of the cases in that series of cases, we stated:

It is clear that no court has jurisdictional power, inclination, time, or expertise to administer the normal disciplinary problems of the Missouri State Penitentiary. Such is clearly the ordinary business of the administration and employees of the Department of Corrections, subject only, so far as this Court is concerned, to the standards required by the Constitution of the United States.

But in Burns v. Swenson, (W.D.Mo., 1969) 288 F.Supp. 4, 10, we were required to state that the Task Force Report on Corrections of the President's Commission on Law Enforcement and Administration of Justice (1967), had then recently concluded that "[c]orrectional administrators have been slow to develop policies and procedures to guide correctional officials and protect the rights of offenders" and that in regard to some correctional institutions, particular penal administrators had offered "strong resistance to the introduction of increased legal controls in the correctional area."

We were able, however, to conclude at the close of the lengthy litigation involving the Missouri Penitentiary that through the revised rules and regulations promulgated during the course of that litigation, the Missouri Department of corrections had made substantial progress in its application of the following principle which we quoted from the Task Force Report on Corrections:

It is important that correctional administrators, who are most knowledgeable about the problems involved, develop policies and procedures which will accommodate the needs of the system as well as the interests of convicted offenders. The more adequate such internal controls are, the less it will be necessary for courts to intervene to define necessary procedures or to review the merits of correctional decisions. (p. 83).

Chief Justice Warren E. Burger, whose concern and interest in the field of corrections is well known, has pointed out that we do not need to abandon or even modify existing legal procedure. In his address to the National Association of Attorneys General at Washington, D.C., on February 6, 1970, he reiterated a recommendation which has been made many times in the past when he said "What we need is to supplement it with flexible, sensible working mechanisms adapted to the modern condition of overcrowded and understaffed prisons . . . . a simple and workable procedure by which every person in confinement who has, or who thinks he has, a grievance or complaint can be heard promptly, fairly and fully."

The Task Force Report on Corrections reveals that efforts to comply with that recommendation have been meager. The Report stated:

There has so far been little consideration of the procedures appropriate for different kinds of correctional decisions. Correctional administrators should assume responsibility for experimenting in this area, and developing procedures which will accommo-date the interests both of prisoners and of the correctional system. Similarly, they should develop guidelines defining prisoners' rights with respect to such issues as access to legal materials, correspondence, visitors, religious practice, medical care, and disciplinary sanctions. Many correctional systems have taken important steps in this direction, but there is a long way to go. (P. 85).

The consent judgment presented in this case reflects a highly exceptional instance in which those responsible for the administration of a particular correctional institution went all the way in their recognition of the duty, which rests upon correctional authorities to provide new procedures consistent with the requirements of the Constitution. This case presents the unusual situation in which all parties and their respective counsel agreed that this mission was accomplished within the framework of this particular litigation.

### III.

The rules and regulations and administrative procedures for the Jackson County Jail approved by the consent judgment are obviously consistent with the recommendation of Chief Justice Burger. Whether these new procedures for the Jackson County Jail will make a fundamental contribution to this new and complicated area of correctional law is dependent upon the manner in which those procedures are administered. In Burns v. Swenson, *supra,* we stated that a great deal more is required than the mere promulgation of fair rules and regulations. We suggested that "[c]orrectional authorities must . . . take effective steps to see that the new procedures established by the new rules are followed, especially in areas involving potential deprivations of a federally protected constitutional right."

Experience has shown that some correctional administrators and others who object to being "dragged into court" by a person charged with or convicted of a crime fail to recognize that it

is basically inconsistent with our whole system of government to grant totally uncontrolled power over the life of any person to any public official. Those persons also fail to recognize and tend to ignore the experience recorded in the Task Force Report on Corrections which teaches that "[w]here administrative procedures are adequate, courts are not likely to intervene in the merits of correctional decisions" and that "where well thought-out policies regarding prisoners' procedural and substantive rights have been established, courts are likely to defer to administrative expertise."

The possibility that this case may make a contribution in regard to other correctional institutions is enhanced by several unique circumstances. Contrary to the situation usually presented, it became apparent at the earliest pretrial proceedings in this case that the parties and their respective counsel were, as they were later able to state in the first paragraph of the consent judgment, to use the parties' language, "mutually desirous of disposing of this suit without extensive litigation" and that all persons concerned were determined to devote their energies to devise procedures which would "meet or exceed minimal constitutional standards regarding the operation and maintenance of the Jackson County Jail and other similar detentional and correctional facilities which defendant Jackson County Jail may in the future provide under the provisions of its charter."

The Honorable George W. Lehr, Presiding Judge of Jackson County, the Honorable Harry Wiggins, Western Judge, and the Honorable Joseph J. Bolger, Eastern Judge, and Sheriff William Kenneth Carnes all approved, both individually and in their official capacities, the consent judgment entered in this case. Those gentlemen and members of their respective staffs worked cooperatively with Ronald L. Roseman, Esq., and Allen M. Ressler, Esq., attorneys for the plaintiffs, and with Thomas J. Walsh, Esq., attorney for Sheriff Carnes, and Herbert M. Kohn, Esq., Tom J.

Helms, Esq., and Austin B. Speers, Esq., attorneys for the County Court, in a highly commendable manner.

Because administrative jurisdiction over the Jackson County Jail changes with the new Charter, all persons concerned with this case consulted with and obtained the suggestions and approval of the officials who will assume new duties under the Jackson County Charter, including but not limited to the Honorable James W. Doarn, the new Director of the Department of Health and Welfare, who will assume responsibility for the administration of the Jackson County Jail January 1, 1973. This Court is most grateful for the cooperation it has received and publicly commends the parties and their counsel for their contributions and assistance.

### IV.

The procedures approved by the consent judgment include a provision for judicial review which, so far as this Court knows, is unique in this rapidly developing field of correctional law. The procedures not only include, to use Chief Justice Burger's words, "a simple, workable procedure by which every person in confinement who has, or who thinks he has, a grievance or complaint can be heard promptly, fairly, and fully; those procedures also provide that one aggrieved by a determination of the impartial administrative tribunal established under those procedures, after an administrative appeal to the Director of the County Department of Health and Welfare, shall have a right to judicial review to the Circuit Court of the Sixteenth Judicial Circuit in accordance with the provisions of the Missouri Administrative Procedures Act and Article V, § 22 of the Constitution of Missouri, V.A.M.S.

Under Missouri law the supervision of the Jackson County Jail has long been one of the responsibilities of the Circuit Court of this County. Indeed, it has long been the duty of grand juries appointed by all circuit courts in the State

and of statutory committees appointed by those courts "to visit the jail of their county, and examine the condition thereof, and inquire into the treatment of the prisoners, and make report thereof to the court." See V.A.M.S. § 221.300.

The circuit courts of Missouri, however, have not been presented with many concrete cases involving the conditions of confinement in the numerous jails in this State because the supplementation of existing legal procedures had not been established until the parties agreed to the procedures regulating the Jackson County Jail as incorporated in the consent judgment in this case.

Implementation of the new Jackson County Jail procedures contemplate that review of administrative decisions made in a State institution will be made in an orderly manner by State court judges, a procedure consistent with the fundamental concepts of our federal system. The distinguished record of the Circuit Court of the Sixteenth Judicial Circuit in the related field of processing post-conviction proceedings under Rule 27.26, V.A.M.R. of the Supreme Court of Missouri insures that reviews of administrative decisions made under the procedures approved by the consent judgment in this case will be made consistent with the principles stated in the Constitution of the United States. Hopefully, the system of State judicial review established in this case may afford a pattern which, if adopted in other jurisdictions, may relieve the pressures which state prisoner litigation is imposing on the federal court system.

### V.

It should be recognized that the problems presented by the Jackson County Jail may be dealt with more effectively in the future because the power and responsibility to enact appropriate local legislation is now vested under the new Charter in the County Legislature rather than the General Assembly. The new County Legislature will undoubtedly become interested in the plans which members of the old County Court have had for a new regional correctional institution. It will undoubtedly become interested in the related question of establishing new community based facilities more in accord with modern penalogical concepts than institutions typified by the sad history of the Jackson County Jail.

Of perhaps greater importance, the County Executive and the County Legislature, prior to the development of any new facilities, may be able to take appropriate steps which could have immediate impact on the problems created by the present physical facilities of the Jackson County Jail. Those problems, in a very real sense, are related to the number of persons traditionally held in custody.

Experience with legislation similar to the Federal Bail Reform Act of 1966 and comparable State statutes establishes that the inmate population of detention facilities may be substantially reduced if courts are furnished proper assistance in connection with their administration of modern bail procedures. As persons entitled to release on personal recognizance bonds and other appropriate procedures are diverted from almost automatic jail confinement, the inmate population of the Jackson County Jail would be substantially reduced and with that reduction, the problems incident to the administration of that institution would accordingly be reduced. We believe that the new county officials will give appropriate consideration to the fact that the cost of providing the State judicial system adequate investigative service in connection with modern bail procedures will be far less than the cost of jail confinement. And we are confident that the Circuit Court of the Sixteenth District, as every other court which has been afforded the opportunity, supplemented by adequate investigative services, will see that all officials charged with the responsibility to set appropriate bail, including the Magistrate Courts, will follow principles which no longer can be properly described as

new or experimental. The end possible result would be that the new administrators of the Jackson County Jail would be required to deal with a substantially smaller number of inmates pending the establishment of new and better facilities.

We are confident that these and other related questions will be given appropriate consideration by all persons under new public responsibilities as the Jackson County Jail begins a new year under the excellent procedures established by the consent judgment entered in this case.

## VI.

For the reasons stated, it is

Ordered that the consent judgment, the Jackson County Jail Rules and Regulations Handbook, which we have heretofore approved and entered, together with this memorandum opinion should be, and the same is hereby ordered to be submitted for publication in the Federal Supplement.

## CONSENT JUDGMENT

Comes now the parties hereto, by and through their attorneys of record, and announce to the Court that they are mutually desirous of disposing of this suit without further litigation and for that reason defendants are willing to consent to the rendition and entry of the following judgment against them, the provisions of which, when fully implemented and complied with, shall be deemed to meet or exceed minimum constitutional standards regarding the operation and maintenance of the Jackson County Jail and any other similar detentional and correctional facilities which defendant Jackson County may in the future provide under the provisions of its charter.

Now, therefore, the Court being fully advised in the premises, having conferred with the parties and their attorneys herein, having reviewed all aspects of this case to date, having fully considered the desirability of disposing of the litigation by means of a consent judg-ment, knowing the same to be freely agreed to by defendants herein as is evidenced by their signatures hereto, and finding that provisions of this judgment are fairly supported by facts on file in this suit;

Does hereby order, adjudge, and decree that the following judgment, consisting of four parts, be and the same is hereby rendered and entered as the judgment of this Court against William Kenneth Carnes, Sheriff of Jackson County, Missouri; Jackson County, Missouri, a political subdivision of the State of Missouri; George W. Lehr, Harry Wiggins, and Joseph J. Bolger, Jr., Judges of the County Court of Jackson County, Missouri, jointly and severally, and the employees, agents and successors of the named defendants in this action; to-wit:

## PART I

### INTERNAL ADMINISTRATIVE PROCEDURES AND GENERAL PROVISIONS

1. Jail authorities will continue to contract with an exterminator to have the entire jail sprayed for insects and rats at least twice a month, or as necessary to eliminate such insects and rodents. Jail authorities will purchase insecticide and jail personnel will spray each area of the jail at least once a week. .

2. Jail authorities will make mops, brooms, and disinfectants available in sufficient quantity and on a daily basis to inmates to insure that their living quarters can be maintained in a clean and safe condition. Jail authorities will have the areas behind the cells cleaned on a regular basis sufficient to eliminate the insect problem. Scouring cleanser and brushes will be issued to inmates daily for the cleaning of shower stalls.

3. Jail authorities will issue clean, sterilized mattresses, in good condition, to every inmate, and will utilize newly-purchased mattresses to comply with this standard. Each entering inmate

will be issued a mattress which has been cleaned and sterilized since its last use.

4. Jail authorities will continue to provide two large fans for each tank and, in addition, will provide fans for *all* inmate living, working, and recreation areas. Jail authorities will continue to replace windows as they are broken, especially during the cold winter months.

5. Jail authorities will take necessary steps to repair any stopped-up or leaking plumbing immediately after learning of such condition. Water will be cut off only in cells which are flooded, and, in such cases, water will be provided for drinking at least every two hours and toilets will be flushed periodically during the day.

6. Standard bath-size towels will be provided to each inmate and sheets will be large enough to allow for shrinkage.

7. Each inmate will be afforded an opportunity to shower at least every other day.

8. Inmates' families or friends will be allowed to provide them with underwear. Indigent inmates in the jail longer than one month will be provided with underwear by the jail authorities. Inmates with sufficient commissary funds will, on request, be provided with underwear, the cost to be subtracted from such funds; such cost will not be greater than the cost to the jail.

9. Each inmate without such shall be furnished with soap, a toothbrush, toothpaste, and shaving gear in sufficient quantity to allow adequate maintenance of personal hygiene.

10. All jail clothing shall be laundered and exchanged at least once a week.

11. Inmates shall be permitted to exercise for at least two hours a week, one hour of which shall be outdoors, weather permitting.

12. Classification procedures shall be instituted, and inmates shall be classified according to age, offense, physical aggressiveness, or other criteria which would warrant separate housing arrangements.

13. Steps shall be taken to establish a work-study release program, particularly for sentenced inmates.

14. The Diagnostic Clinic shall expand its group and individual counseling program, and ensure an increase in remedial and basic educational and religious programs.

15. Newly-hired Treatment Correctional Officers shall receive a minimum of 80 hours training at the Regional Center for Criminal Justice and 40 hours training in communication provided by the Greater Mental Health Foundation.

16. Each inmate shall be provided with a copy of the jail handbook, which shall include a complete listing of all institutional rules and regulations. The handbook shall also set forth hearing procedures and the sanctions which may be imposed for each infraction or class of infraction. An inmate may be disciplined only for violations of rules listed in the handbook, and for no other reason. No sanctions other than those listed in the handbook shall be imposed.

17. Any inmate accused of violating an inmate conduct regulation as set forth in the Inmates Rules and Regulations Handbook, shall be afforded the following procedures before imposition of any sanction:

a. The inmate shall have written notice of the specific charges against him.

b. The inmate shall have the opportunity to present his case before an impartial tribunal, which shall consist of one person from the Sheriff's staff, one person from the Diagnostic Center, and one inmate from the Inmate Council.

c. The hearing shall be held within 72 hours of the alleged incident, and the inmate shall be afforded as much time as requested to prepare his case.

d. The inmate shall be afforded the opportunity to confront his accusers, cross-examine opposing witnesses, and call witnesses in his own behalf.

e. The tribunal shall privately review the testimony. Any finding of guilt shall be predicated upon a finding that there is substantial reason to believe that the inmate has committed the alleged infraction.

f. A written record of the tribunal's findings and conclusions and testimony in support thereof shall be maintained for at least one year.

g. There shall be a right to appeal to the Director of the County Department of Health and Welfare; in no case may any sanction imposed by the tribunal be increased upon or after review.

h. Appeals from any final decision of the Director of Health and Welfare shall be to the Circuit Court of the Sixteenth Judicial Circuit in accordance with the provisions of the Missouri A.P.A., Chapter 536 of the Revised Statutes of the State of Missouri and Article V, Section 22 of the Missouri Constitution.

18. If an inmate is charged with a violation that could also be prosecuted in state or federal court, he shall be advised that his case may be referred to the prosecuting attorney; that he has the right to remain silent; that anything he says can and may be used against him at a subsequent trial; that he has the right to counsel; and that if he cannot afford counsel, one will be provided at no expense to him.

19. There shall be no discipline of an entire group of inmates unless it is determined that all the inmates to be disciplined participated in the wrongful act (except in quelling riots, mass destruction of property, or other mob activity). The jail shall make an attempt to remove non-participants in the event of mob activity.

20. Isolation may not extend beyond fourteen days, unless voluntary or certified in writing by a medical doctor as medically necessary. An inmate in isolation shall receive all the hygienic articles necessary to keep himself and his cell in a clean condition. He shall receive the same food, mattresses, and showers afforded other inmates, unless the jail psychiatrist certifies in writing that such items are or may be harmful to the health or safety of the inmate, and visits shall be the same as for inmates in general population. Inmates in isolation shall be seen by a medical doctor or psychologist at least twice a week, and shall be allowed to exercise outside their cells daily.

21. Inmates can subscribe and receive books, magazines, and periodicals. Books, magazines, and periodicals can be denied an inmate only if the publication poses a direct, clear, and immediate danger to the security of the institution or if the publication is obscene as a matter of law.

22. When a publication is withheld from an inmate due to the obscenity of the publication or they believe the publication poses a direct, clear, and immediate danger to the institution, an inmate shall then receive:

a. notice that the publication is being withheld,

b. some opportunity for the inmate either in writing or personally to object,

c. and a decision by a body that can be expected to act fairly and in accordance with the test laid out in these regulations.

23. No restrictions shall be placed on the identity of correspondents, on the number of correspondents, on the number of letters an inmate may send or receive, or on the length of letters.

24. All outgoing mail shall be sealed by the sender and placed in the United States mailbox from which mail is delivered direct to the United States carrier.

25. Outgoing mail shall not be inspected, censored, delayed, or otherwise interfered with.

26. Letters may be typed or handwritten.

27. Incoming mail from attorneys, courts, Governor of the State of Missouri, member of the United States Con-

gress, and the House and Senate of the State of Missouri, shall remain sealed and be delivered directly and immediately to the inmate addressee.

28. All incoming mail, other than that listed in paragrah 27 above, shall be opened in the presence of the inmate addressee if the letter indicates on its face that it is to be opened in the presence of the addressee. All other incoming mail may be opened only for the purpose of inspecting for contraband and afterwards be delivered directly and immediately to the addressee.

29. Incoming and outgoing letters may be in any language.

30. If the inmate so requests, incoming and outgoing mail to and from the parties listed in paragraph 27 will be recorded in a central "official correspondence log."

31. Inmates may receive books and similar legal materials subject only to regulations concerning obscenity and threats to the security of the institution.

32. Inmates' subscriptions to newspapers, magazines, and other periodicals, in any language, shall be permitted without restriction unless said publications have been judicially determined to be obscene under applicable constitutional standards, or otherwise violative of the federal postal laws.

33. The institution shall provide indigent inmates with sufficient postage for all correspondence with their attorney of record, courts, the Governor of the State of Missouri, and two other one-ounce, first-class letters each week. Indigent inmates shall be provided with paper, pencils, envelopes, stamps, and other writing aids. An indigent inmate is one who has no money or means of support.

34. The institution shall provide free notary service to all inmates, such notarization to take place in the presence of the inmate.

35. There shall be no additional restrictions on inmate correspondence for disciplinary, punishment, or any other reasons unless his correspondence has violated rules as to contraband; and then upon a proper showing of the alleged violation, his mail may be restricted, but this shall not apply to any restriction of attorney-client mail or court correspondence.

36. Inmates shall be allowed at least two telephone calls per week. Each such call shall be allowed for a period of at least three minutes.

37. Visits shall be allowed on a weekly basis. Children, accompanied by an adult, shall be allowed entry for visitation. Every effort shall be made to increase visitation privileges to at least twice a week.

38. Private consultation rooms for attorney visits shall be maintained in A, B, C, D, E, F, G, H, and I tanks. These rooms shall be free of both auditory and visual intrusion, except for one small look-through glass panel. Steps shall be taken to make consultation rooms available in the remaining jail areas by March 31, 1973.

All provisions and actions required by and referred to in Part I of this Consent Decree shall be implemented and complied with by defendants no later than January 1, 1973.

## PART II

### DIET AND FOOD PREPARATION

1. There shall be a Food Service Manager who is in charge of food service. This person shall have technical training and experience in food service. This person must have management skills and be given direct authority over the kitchen operation.

2. The menu shall be planned by a dietitian to assure that the diet is properly administered and that proper food techniques are followed.

3. The menu shall include the recommended dietary allowance for food nutrients specified by the National Academy of Science, Food and Nutrition Board. These standards can be met for the adult inmates by following these recommendations. The daily diet must include: 2 servings of milk or cheese, 2 or more servings of meat, fish, poultry, eggs, or legumes, 2 servings of fruits and vegetables, and 2 or more servings of breads and cereals.

4. Any diet prescribed by a physician must be provided for the patient. The foods allowed and not allowed for a prescribed diet must be authorized by either a registered dietitian or a physician. All diabetics must have a diet according to the above format (The Basic Four) unless further requirements are ordered by the physician. Many diabetics need either a mid-morning, mid-afternoon, or evening nourishment, or they may require additional nourishment at all of these times depending upon the type of insulin they take.

5. A record giving the name of the person and the diet he is on must be available for the cooks at all times as well as those serving the modified diets. A list of foods allowed for each of the prescribed diets must also be available for the cooks at all times.

6. In order for storage facilities to meet minimum specifications, the following must be done:

(a) All food items must be covered securely.

(b) All food containers containing food must be placed on racks off the floor.

7. There must be a system for the rotation of supplies so that old stock is used first.

8. Food shall not be allowed to sit at room temperature and must be covered while being transported to the prisoner area.

9. Prisoners being isolated for screening of infectious diseases, such as malaria, must be allowed to serve themselves, and they must be served with disposable utensils. Disposable utensils may be used only one time.

10. The jail kitchen must be maintained in a safe and sanitary condition. To insure that this objective is met, the following shall be done:

(a) There must be a daily and weekly cleaning schedule for all equipment in addition to the floor, walls and vents.

(b) The Jackson County Health Department should conduct periodic inspections of the kitchen facilities to insure that the kitchen meets health and sanitary requirements established for food services that operate within the County.

(c) Eating utensils must be made to withstand temperatures to 170° or more in order for them to be sanitized. In the alternative, plastic disposable spoons may be used for each individual meal.

(d) Kitchen equipment must be operational and safe for use, and must be adequate to prepare food for at least 500 persons.

(e) Food carts will be provided that contain adequate hearing units to insure that hot food is served at the proper temperature.

All provisions and actions required by and referred to in Part II of this Consent Decree shall be implemented and complied with by defendants no later than March 1, 1973.

## PART III

### LAW LIBRARY

There will be a law library maintained and provided for inmates which, in addition to the following books, shall also include an adequate supply of legal size stationery and two manual typewriters in good working order:

1. Volumes 38, 39, 40 & 41 V.A.M.S.

2. Missouri Rules of Court Pamphlet

3. Vernon's Annotated Missouri Rules (Rules 1–102 in Four Volumes)

4. Southwestern Reporter—Missouri Cases Only (last 10 years to date)

5. Black's Law Dictionary

6. Missouri Digest (1 set)

7. Titles 18 and 28, United States Code Annotated

8. Federal Practice & Procedure by Wright & Miller Volumes 1–3 only

9. Supreme Court Reporter (1953 to date)

10. Corpus Juris Secundum—Criminal Law Sections only (7 volumes)

11. Federal Rules of Criminal Procedures Pamphlet

12. Missouri Revised Statutes plus yearly supplements (1969 Ed.)

The foregoing legal works shall be kept current yearly and supplements thereto shall be purchased when issued by the publishers.

All provisions and actions required by and referred to in Part III of the Consent Decree shall be implemented and complied with by defendants no later than March 1, 1973.

PART IV

MEDICAL & DENTAL

1. There shall be a single administrative chief of the Medical Service who shall oversee and be responsible for the overall health care program at the jail. The goal of the service shall be to provide comprehensive "primary medical care."

2. There shall be sufficient examining room and short term observation rooms in order to provide adequate primary medical care.

3. A uniform system of medical records shall be maintained on each inmate who enters the jail for documenting initial health status of inmates, plans, if any, for diagnosis and treatment, and their outcome (followup) when instituted for any reason by the medical staff participating in inmate care.

4. A structured system for pharmacy storage and distribution shall be established in accord with the medically recognized standards in pharmacy service.

5. At no time are inmates or trustees to assist in dispensing medication.

6. Each inmate upon entering the jail shall have his medical history taken and then be given a physical examination by a physician or supervised by a physician, and any laboratory test that may be necessary will be made.

7. No inmate shall be denied the privilege of seeing the physician, except with the concurrence of the Chief of the Service, after he has been examined.

8. A member of the medical team shall visit each housing unit daily at regular preset times to evaluate complaints, perform medical counseling, and schedule follow-up appointments. Each request for medical treatment, whether written or oral, shall be followed up without fail.

9. There shall be sufficient staff to provide one full time M.D. or D.O., to be assisted by residents and students for daily sick call and new admissions, and one Registered Nurse to be on duty from 8:00 a. m. to 4:00 p. m. daily, Monday through Friday. There shall be sufficient physician assistants to provide medical coverage 24 hours a day, 7 days a week. One pharmacy technician shall be provided 8:00 a. m. to 4:00 p. m. Monday through Friday.

10. Any follow-up appointments with doctors made for inmates either while the inmate is at General Hospital or in the jail shall be kept. If for some reason these appointments cannot be kept, it is the health service's responsibility to arrange for a new appointment with the respective doctor, and the jail's responsibility to insure that this appointment is kept.

11. Jail personnel shall receive a training course that would facilitate recognition of acute and/or chronic illness.

12. The Diagnostic Clinic shall work closely with the Medical Service. Some of the demands of the Medical Service

would be reduced by the referral to the diagnostic unit of prisoners exhibiting high anxiety levels, psychosomatic symptomatology, or other emotional or stress manifestations.

13. Health assistant training programs for inmates should be provided, possibly by the vocational-technical training program of the public school system.

14. Dental care shall be provided that will insure good dental care to relieve pain, eliminate infection, and the preservation of viable teeth.

All provisions and actions required by and referred to in Part IV of this Consent Decree shall be implemented and complied with by defendants no later than March 15, 1973.

The Court hereby retains exclusive jurisdiction in the action until such time as the terms hereof are complied with by the defendants herein and their employees, agents and successors.

## APPENDIX

### I

### INTRODUCTION

*Necessity for Rules and Regulations*

You are now living in a community which is necessarily different in some respects from community living in free society. However, it is important for you to remember that every community, whether it is an institution or elsewhere, has certain basic characteristics that are to be found in every other community. The reasons for this are not hard to understand.

Whenever people live together, they find it necessary to establish rules and sets of procedures to provide for their security and general welfare. If there were no laws and other regulations governing the conduct of individuals, the community would be a place of confusion and danger resulting in breakdown of the group and chaos. For the protection and well-being of all the members of a community group, controls must not only exist but must also be enforced.

In any institution where many persons must live and work together in a confined area, exceptional care must be taken to maintain reasonable order and to protect persons and property. Discipline is an absolute requirement of institutional life. Inmates who observe the ordinary decencies and courtesies of life will have very little difficulty in obeying the rules, because while rules necessarily put some limitations on freedom of action, they do not fail to recognize the basic rights of the individual as a person. Your fundamental rights will be respected, and it is expected that you will respect the rights of other inmates and the members of the Jail Staff.

### II

*Regulations for Inmate Conduct*

Each inmate is provided with a copy of this handbook upon admission to the jail; you should read this handbook thoroughly and keep it in your cell. Learn the jail rules and observe them, so that you will know what is expected of you and what you may and may not do. Violations of any rule or regulation in this handbook may subject the inmate to disciplinary action. If you cannot read, or if you are not sure what a rule means, ask a member of the professional or correctional staff to read and/or explain the rules to you. If you are still confused, write the Chief of Correction's office and request a written explanation.

This booklet includes a complete listing of rules inmates are expected to follow. Additional rules, as well as amendments to these rules, may be proposed from time to time by the Chief of Corrections and distributed to inmates.

If, after a hearing pursuant to the Disciplinary Hearing Procedures, an inmate is found to have committed a violation, he is subject to one or more of the

following sanctions outlined on pages 12 and 13.

## (A) Rights

Every human being is a person with dignity, intelligence and free will. By virtue of this, he has rights and duties flowing directly from his very nature. These rights and duties are universal, inviolable and inalienable.

Residents serving sentences are confined as punishment. Residents awaiting trial are confined to insure proper investigation and availability for trial. In either case residents are entitled to the following rights pertinent to their stay in this institution.

A. You have the right to be protected against crimes against your person or property such as theft of your property, assault in any form, homosexual advances and defamation of character. Action which constitutes criminal offenses in the free society are also illegal in this institution. It is as much your duty to report them as it was you duty prior to arriving here.

B. You have a right to write a letter to the Chief of Corrections, or the Director of the Department of Health and Welfare; enclose in a sealed envelope and the letter will be delivered direct to the addressee without censorship. Your privacy and confidentiality will be respected in these cases also.

C. You have a right to have in your possession the items listed on page 8.

D. You have a right to be treated courteously, decently and fairly.

E. You have a right to adequate shelter, food, clothing and medical attention.

F. You have a right to available treatment services which help you help yourself in the task of bettering your life and avoiding future conflict with the law.

G. All inmates are entitled to report any grievances or violations of a law or regulation in the following order:

a. By sending a sealed and uncensored communication to the Chief of Corrections, he shall instigate an investigation to determine if a satisfactory solution to the grievances can be obtained.

b. If not resolved to the inmates satisfaction he may follow the same procedure to the Director of the Department of Health and Welfare in a sealed uncensored communication.

H. As a resident of this correctional institution you have a right to prompt reasonable and reliable answers to your valid questions.

I. You have the right to religious counseling services conducted at the institution.

J. You have the right to quiet and dignity while divine services are be conducted.

K. You have the right to avail yourself of the Law Library.

## (B) Privileges

The following privileges are granted to each resident upon arrival at this institution.

A. Commissary purchase privileges not to exceed $7.00 merchandise per week. (Commissary items may be kept in living spaces).

B. Smoking privileges in living quarters, classroom, gym and outdoor areas.

C. Education privileges.

D. Library services.

E. Recreational activities.

F. Work privilege upon written application.

You may have an opportunity to work in the institution. Work is a privilege which can be gained through good behavior. A written application for such

should be submitted to the Chief of Corrections. Sentenced residents can earn "work time" which will be deducted appropriately from his sentence. Unsentenced residents can also earn "work time" but it will be up to the discretion of the Court whether or not this can be credited to your sentence. An example of "work time" is that every three days you work you actually receive four days credit against your original sentence. Hence, if you are sentenced to 100 days confinement and you work from the first day you are in the Correctional Institution and your behavior was good you would have served your sentence at the end of 75 days.

G. You may correspond with your family, legal counsel and other officials in accordance with separate instruction promulgated by this institution. (See section V).

H. You may receive visits from members of your immediate family, a minister, priest or rabbi of your choice and an attorney may visit you as often as necessary to prepare your case, except during meal times and regular visiting hours which are reserved for families.

I. You may request an interview with the Chief of Corrections or the Social Service Staff, regarding any problem you may have. You are assured that these personnel will be a fair and impartial listener who will respect your privacy and the need for confidentiality in accordance with the ethics of their profession.

### (C) Responsibilities

Each resident has the following responsibilities, which are essential in insuring that the rights of all residents are protected.

A. You are personally responsible for bathing and shaving each day, keeping your assigned living space clean and in good order and the public property

loaned to you for your comfort in good condition.

B. You must wear appropriate clothing for the activity in which engaged.

C. Humanness demands that you treat your fellow residents and institutional employees courteously, decently and fairly. Profane, obscene or loud language is prohibited. Treat others as you wish to be treated.

D. You must not fight, cause disturbance in a group, engage in a demonstration or participate in any activity which is contrary to the maintenance of good order.

E. You may not use any public property for any purpose other than the purpose for which the property was designed.

F. You must throw cigarette butts, matches, papers and other debris in trash receptacles and not on the floor.

G. You must make up your bunk prior to breakfast each day. Bunks will remain made up until after the evening meal; the only exception will be for medical reasons and night workers. You may rest on top of the bunk, however, you must remove your shoes. You must keep your mattress *covered* at all times either with a mattress cover or a sheet.

H. You must not gamble in any manner.

I. Justice requires that you respect the personal property rights of fellow residents and that you do not take or damage what does not belong to you.

J. You must read and understand your responsibilities. If there are any questions, ask the Correctional Officers in-charge to explain them to you.

K. You must not have in your possession any items not listed below. Other items are contraband, possession of which will subject you to disciplinary action.

(D) List of Authorized Items for Residents

I   1 T Shirt
    1 Pair Undershorts
    1 Pair Socks
    1 Pair Shoes
    1 Shirt
    1 Pair Pants
    2 Sheets
    1 Pillow Case
    1 Pillow
    1 Towel
    1 Blanket

II  Stationery to be purchased from commissary.

III All items that are available in the residents commissary.

IV  Books from the residents library; not more than four books.

V   Other items approved by Chief of Corrections, such as family pictures, radio, prayer books and dictionary

(E) Resident Clothing Regulations

The manner of wearing the institutional clothing is often taken as a reflection of the individuals pride in himself. Each resident is encouraged to keep himself and his clothing clean and neat.

Generally, each garment will be worn as follows:

1.  Shirt—Shirts with square shirt tails may or may not be tucked in trousers. Shirts with long shirt tails will be tucked in trousers. Shirts may be removed in the dormitories, when engaged in athletics, when working in shops, and when working in the laundry or kitchen.

2.  Trousers—Trousers will be worn full length. Bermuda shorts are optional during warm weather.

3.  Shoes—Shoes will be laced up at all times except when in assigned dormitory.

4.  Socks—Socks will be worn at all times except that they may be removed in the dormitory or gym.

5.  Underwear—Undershirts and underdrawers will be worn at all times except when showering. Undershirts may be removed when engaged in athletics.

### III

*Disciplinary Procedures*

A.  Any inmate accused of violating an inmate conduct regulation as set forth in this handbook shall be afforded the following procedures:

1.  The inmate shall have written notice of the charge against him within 24 hours of the offense.

2.  The inmate shall have the opportunity to present his case before an impartial tribunal, which shall consist of one person from the Chief of Corrections Staff, one person from the Diagnostic Center and one inmate from the Inmate Council.

3.  The hearing shall be held within 72 hours of the alleged incident, and upon the request of the inmate, additional time will be granted to prepare his case.

4.  The inmate shall be afforded the opportunity to confront his accusers, cross-examine opposing witnesses, and call witnesses in his behalf.

5.  The tribunal shall privately review the testimony. Any finding of guilt shall be predicated upon a finding that there is substantial reason to believe that the inmate has committed the alleged infraction.

6.  A written record of the tribunal's findings and conclusions and testimony in support thereof shall be maintained for at least one year.

7.  There shall be a right to appeal to the Director of the County Department of Health and Welfare; in no case may any sanction im-

posed by the tribunal be increased upon or after review.

8. Appeals from any final decision of the Director of Health and Welfare shall be to the Circuit Court of the Sixteenth Judicial Circuit in accordance with the provision of Missouri Administrative Procedure Act, Chapter 536 R.S.Mo. and Article V § 22 of the Missouri Constitution.

B. If a case is referred to the prosecuting attorney for prosecution, then no internal disciplinary procedure will be held pending the decision of the prosecutor to charge the accused with a crime.

C. Any inmate who has allegedly committed an act that is in violation of the rules of this handbook and is so charged may be placed immediately in administrative segregation pending a determination by the disciplinary tribunal within 72 hours. Administrative segregation is to be used only for offenses that place the inmate in danger to himself or others, or his acts may or will lead to the destruction of property.

D. Any inmate charged with a violation that could also be prosecuted in state or federal court shall be advised that he has the right to remain silent; that anything he says can and may be used against him at a subsequent trial; that he has the right to counsel; that if he cannot afford counsel one will be appointed for him at no expense to him for defense of any action filed against him in a court of law.

E. Isolation may not extend beyond fourteen days, except for class I offenses and then only unless voluntary or certified in writing by a medical doctor that such isolation will not be injurious to the inmate's physical or mental health. An inmate in isolation shall receive all the hygienic articles necessary to keep himself and his cell in a clean condition.

He shall receive the same food, mattresses, and showers afforded other inmates, unless the jail psychiatrist certifies in writing that such items are or may be harmful to the health or safety of the inmate.

Visits shall be the same as for inmates in general population.

Inmates shall be seen by a medical doctor or psychologist at least twice a week, and shall be allowed to exercise outside their cells.

### CLASS I OFFENSES

| Charge | Minimum | | Maximum |
|---|---|---|---|
| Murder or Manslaughter | 14 days isolation | — | 45 days isolation |
| Aggravated Assault against fellow inmate (with weapon or object) | 14 days isolation | — | 45 days isolation |
| Assault on Detention Officer | 14 days isolation | — | 45 days isolation |
| Escape (also attempts) | 14 days isolation | — | 45 days isolation |
| Running from Detention Officer | 14 days isolation | — | 28 days isolation |
| Possession of Escape Contraband | 14 days isolation | — | 28 days isolation |
| Arson (arson attempts, fire or explosives) | 14 days isolation | — | 45 days isolation |
| Contraband (possession or dealing, narcotics, money, firearms), except marijuana | 14 days isolation | — | 28 days isolation |
| Criminal damage to County property (over $50.00) | 14 days isolation | — | 45 days isolation |
| Rape and other sex offenses | 14 days isolation | — | 45 days isolation |
| Fighting, no weapon (except self defense) | 14 days isolation | — | 28 days isolation |
| Other felony offenses, punishable by courts | 14 days isolation | — | 45 days isolation |

ISOLATION: Restricted to a single cell and only removed for showers, shaves, courts, visiting, sick call. To be exercised daily outside cell for ½ hour.

## CLASS II OFFENSES

| Charge | Discipline Minimum | | Maximum |
|---|---|---|---|
| Theft (under $50.00) | No recreation 7 days | — | No recreation 14 days |
| Damage to County property (under $50.00) | No recreation 7 days | — | No recreation 14 days |
| Possession of needle or syringes (including home made) | No recreation 7 days<br>Segregation 7 days | —<br>— | No recreation 14 days<br>Segregation 30 days |
| Possession or smoking marijuana | No recreation 7 days<br>No commissary 7 days | —<br>— | No recreation 14 days<br>No commissary 28 days |
| Sniffing glue | No recreation 7 days | — | No recreation 14 days |
| Making or possession of hooch | Segregation 21 days | — | Segregation 45 days |
| Threatening an employee (including any County employee) | No recreation 7 days<br>No phone calls 7 days | —<br>— | No recreation 14 days<br>No phone calls 14 days |
| Attempted bribery of an employee | Segregation 15 days | — | Segregation 30 days |
| Refusing to go or come from cell | Segregation 7 days<br>No recreation 7 days | —<br>— | Segregation 45 days<br>No recreation 21 days |
| Refusing to obey an order or in-subordination | No recreation 7 days | — | No recreation 21 days |
| Unauthorized food in cell areas | No commissary 5 days | — | No commissary 10 days |
| Altering clothing | Segregation 7 days<br>No commissary 7 days | —<br>— | Segregation 14 days<br>No commissary 15 days |
| Blocking cell doors | Segregation 7 days | — | Segregation 14 days |
| Fouling head count or distribution of medication | Segregation 7 days | — | Segregation 14 days |
| Any violation of State law, County or City ordinances punishable by courts | Segregation 7 days | — | Segregation 24 days |

SEGREGATION: Assigned to single cell, however, entitled to any privileges other inmates are allowed in same area.

◆

## IV

### Personal Property

A. Prior to incarceration, a prisoner will be searched to remove items of personal property not allowed in the cell. Items of contraband will be confiscated.

1. Personal items carried in pockets, including shoe laces, belts, and jewelry will be recorded on property receipts and placed in property file envelope. Items will be carefully logged.

2. Prisoner's clothing (except underwear and socks) will be placed in a sealed container with his name and number marked on the seal. He will then be issued jail clothing to wear while he is incarcerated. He will be responsible for damage done to the clothes while they are in his possession. Shoes that could possibly be used as weapons will not be allowed in the cell. They will be marked and placed in the property room, along with the prisoner's clothing.

3. Personal items allowed to a prisoner are privileges. Any privilege that is abused will no longer be a privilege.

a) Money may be left at the jail for prisoners by friends and relatives during the day shift and the evening shift. This allowance is for purchases from the jail commissary.

## V

### Communications

Mail and Receipt of Publications

A. Inmates can subscribe to and receive books, magazines and periodicals. Books, magazines and periodicals can be denied an inmate only if the publication poses a direct, clear and immediate dan-

ger to the security of the institution or the publication is obscene as a matter of law.

B.   No restrictions shall be placed on the identity of correspondents, on the number of correspondents, on the number of letters an inmate may send or receive or on the length of letters.

C.   All outgoing mail shall be sealed by the sender and placed in the United States mailbox from which mail is delivered directly to the United States carrier.

D.   Outgoing mail shall not be inspected, censored, delayed or otherwise interfered with.

E.   Letters may be typed or handwritten.

F.   Incoming mail from attorneys, courts, Governor of the State of Missouri, member of the United States Congress and the House and Senate of the State of Missouri, shall remain sealed and be delivered directly and immediately to the inmate addressee.

G.   All incoming mail, other than that listed in paragraph F above shall be opened in the presence of the inmate addressee if the letter indicates on its face that it is to be opened in the presence of the addressee. All other incoming mail may be opened only for the purpose of inspecting for contraband and afterwards be delivered directly and immediately to the addressee.

. H.   Incoming and outgoing letters may be in any language.

I.   If the inmate so requests, incoming and outgoing mail to and from the parties listed in paragraph F above will be recorded in a central "official correspondence log."

J.   Inmates may receive books and similar legal materials subject to regulations concerning obscenity and threats to the security of the institution.

K.   Inmates' subscriptions to newspapers, magazines, and other periodicals, in any language, shall be permitted without restriction unless said publications have been judicially determined to

be obscene under applicable constitutional standards, or otherwise violative of the federal postal laws.

L.   The institution shall provide indigent inmates with sufficient postage for all correspondence with their attorney of record, courts, the Governor of the State of Missouri, and two other one-ounce, first-class letters each week.

M.   When a publication is withheld from an inmate due to the obscenity of the publication or they believe the publication poses a direct, clear, and immediate danger to the institution, an inmate shall then receive:

1.   Notice that the publication is being withheld,

2.   Some opportunity for the inmate either in writing or personally to object,

3.   And a decision by a body that can be· expected to act fairly and in accordance with the test laid out in these regulations.

### Telephone Privilege

This institution recognizes that the privilege of making phone calls is important to the reintegration process of returning a resident to the community.

1.   Upon being incarcerated and upon completion of attendant paperwork, the duty jailor will permit the inmate to complete a telephone call to the person of his choice, such as an attorney, bondsman, relative, or a friend. If the inmate is unable to complete his call satisfactorily (the person is absent, etc.), the jailor shall permit a second call to a different person, or even a third in an unusual circumstance. Three calls a week may be made from lock up area or recreation area.

2.   Officers will not permit inmates to take incoming calls. Officers may not take down and refer personal incoming messages for inmates unless in emergencies. Calls from attorney, bondsmen,

other officer, etc., where the information is of an official nature, such as a change in court date may be relayed to the inmate but only on the day shift. *Guards will not make calls for inmates.*

3. The Chief guard and assistant chief guard may exercise a certain degree of latitude in unusual cases, such as a telephone call concerning a death in the family or other unusual circumstances. Under no circumstances are such calls to be made or received without one officer present.

4. Telephones are available for personal calls for 2 hours, 3 nights per week. The inmate council schedules the rotation of phones and posts the schedule in each area. The inmate council member from each tank is responsible for scheduling the use of phone in his area.

5. Unusual circumstances, should the inmate be combative, intoxicated, drugged, mentally unable to function properly, or in any other way incapable of normal function at the time of incarceration, he may be incarcerated without calling providing that relief officers are clearly advised of this in writing so that the person may call when his situation improves.

## VI

*Inmate Hygiene, Recreation and Medical Services*

A. Each inmate shall be afforded an opportunity to shower at least twice a week.

B. Each inmate without such shall be furnished with soap, toothpaste, and shaving gear in sufficient quantity to allow adequate maintenance of personal hygiene.

C. All jail clothing shall be laundered and exchanged at least once a week. You will be furnished with linens and bath size towels.

D. Inmates should be permitted to exercise at least two hours a week; one hour of which shall be outdoors, weather permitting.

E. You must keep your cell and assigned area clean at all times.

1. The cells will be swept and mopped daily with supplies furnished by the jail's authority.

2. Prisoner's personal items will be neatly stored and placed under bunks.

3. Articles of trash will be placed in the trash container and not strewn about on the floor of the cell.

4. At no time will cigarette butts be on the floor.

F. Medical Services—

The medical facilities at this institution consist of a complete infirmary, which is a direct affiliation of Jackson County Public Hospital. The infirmary is staffed by a Physician, a licensed Practical Nurse and a group of Physician's Assistants (Trained Corpsmen).

Upon your arrival you will receive a complete physical and all necessary tests, any medical treatment which may be necessary upon your arrival or during your stay will be under the direction of the institutional physician and/or the Health Care Staff.

If you have reason to believe you have a medical problem, you should investigate medical action by presenting your complaint to the Health Care Staff, who's discreation it will be to evaluate your complaint and decide if in fact a medical problem exists. If such a problem does exist, the Health Care Staff will formulate treatment under the direction of the institutional physician, or if deemed necessary, will make arrangements for further treatment.

The hours from 9:00 a. m. until 5:00 p. m.—Monday through Friday have been designated as general sick call hours. During these hours you may request to see the Health Care Staff and an evaluation of your medical complaint will be made.

Emergency situations will be treated as they arise.

## VII

### Visiting

A. Inmates will receive not more than three visitors on any given visiting day.

B. Adult inmates may receive visits between the hours posted as official visiting hours.

C. Visits will be limited to 15 minutes duration in usual cases and not over 30 minutes in any case in order to allow all inmates to receive their visitors.

D. Visitor's Register

1. Persons wishing to visit with an adult or juvenile inmate must be on the visiting list. This is to be verified by identification.

E. Visitors subject to search.

1. Guards are to search any person they have probable cause to feel are carrying contraband or may have a weapon. Visitors refusing to be searched are to be immediately removed from the jail.

F. Conduct of visitors.

1. Visitors in the jail must conduct themselves in an orderly manner.

2. Any visitor using loud and/or profane language, becoming hostile or combative, abusive toward other visitors or officer, failing to obey instructions or in any other way conducting themselves in a manner tending to upset the normal routine are to be expelled from the jail and if the situation warrants, prohibited from visits.

## VIII

### Commissary

You will be allowed to order commissary items each evening with the exception of Friday, Saturday, and the day preceeding holidays. The commissary will be delivered to you on the following day.

## IX

### Attorney Visits

A. Attorneys may see their clients Monday through Friday from 8:30 a. m. to 10:30 a. m. and 12:30 p. m. to 3:30 p. m. Saturday from 8:00 a. m. to 10:30 a. m. All other times can be pre-arranged with the department head. All efforts will be made to insure that your attorney will be able to see you when necessary regardless of the time period.

B. Attorneys may request a private consultation room in order to confer with their clients, and all efforts will be made to provide for such an area.

## X

### Religion

A. If the institution contains a number of inmates of the same religion, a qualified representation of that religion shall be appointed or approved by the Chief of Corrections. If the number of inmates justifies it and conditions permit, the arrangements should be on a full-time basis.

B. A qualified representative appointed or approved under paragraph (A) shall be allowed to hold regular services and to pay pastoral visits in private to inmates at proper times.

C. Access to a qualified representative of any religion shall not be refused to any inmate. On the other hand, if any inmate should object to a visit of any religious representative, his attitude shall be fully respected.

D. So far as practicable, every inmate shall be allowed to satisfy the needs of his religious life by attending the services provided in the institution and having in his possession the books of religious observance and instruction of his denomination or beliefs. While in punitive segregation he will be permitted to see his religious advisor and have in his possession his books of religious instruction.

## XI

*Diagnostic and Rehabilitation Services*

A. Crisis Counseling:

Psychological counseling will be available on request from the D/R Unit. This will consist of short term counseling, extended psychotherapy will not be provided. This service will be available on request or offered on referral from a correctional officer or jail administration.

B. Social and Psychological Evaluation:

1. A complete diagnostic evaluation will be offered to all inmates sentenced to the county jail. This evaluation will be used to assist the inmates in obtaining employment, rehabilitative assistance or treatment that he desires upon release.

2. Diagnostic evaluation will also be offered to inmates when requested by the courts for use in pre-sentence investigations, parole hearings or parole revocation proceedings.

C. Employment counseling services will be available to inmates just prior to their release date.

D. Limited group therapy programs will be carried on in the jail when time is available and the D/R Unit staff can identify a group that can profit from a particular program.

## XII

### *Amendments*

These rules and regulations may be amended, supplemented or changed from time to time as need arises, provided, however, that no changes be made contrary to the provisions of the Consent Decree entered and rendered December 29, 1972, in the case of Goldsby v. Carnes et al., No. 20122–1, United States District Court for the Western District of Missouri.