**Booker GOLDSBY et al., Plaintiffs,**

v.

**Sheriff William Kenneth CARNES et al., Defendants.**

**Civ. A. No. 20122–1.**

United States District Court,
W. D. Missouri, W. D.

March 24, 1977.

Ronald L. Roseman, Legal Aid and Defender Society, Kansas City, Mo., for plaintiffs.

Willard B. Bunch, Kansas City, Mo., for defendants.

MEMORANDUM OPINION AND ORDER DIRECTING ENTRY OF FIRST AMENDED CONSENT JUDGMENT

JOHN W. OLIVER, District Judge.

I.

On January 3, 1973, this Court filed a memorandum opinion and entered a consent

judgment in the above case involving the Jackson County Jail in Kansas City, Missouri. An appendix to that consent judgment establishing rules and regulations for the jail was approved and filed on February 8, 1973. See *Goldsby v. Carnes,* (W.D.Mo. 1973) 365 F.Supp. 395.

This case now pends on the joint motion of the parties for the approval of a first amended consent judgment and the approval of certain memoranda and agreements attached thereto and made a part thereof by reference. The joint motion will be granted and the first amended consent judgment entered of record for the reasons we now state.

## II.

Our January 3, 1973 memorandum opinion directed attention to the impact of *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), on federal court jurisdiction in cases involving state and local correctional institutions and to the Task Force Report on Corrections of the President's Commission on Law Enforcement and Administration of Justice (1967), written some six years after the decision of the Supreme Court of the United States in that case. We noted that the Task Force Report had concluded in 1967 that, generally speaking, "correctional administrators have been slow to develop policies and procedures to guide correctional officials and protect the rights of offenders" and that, in some instances, particular correctional administrators had offered "strong resistance to the introduction of increased legal controls in the correctional area."

We were able, however, to state in our original 1973 memorandum opinion in this case that:

The consent judgment presented in this case reflects a highly exceptional instance in which those responsible for the administration of a particular correctional institution went all the way in their recognition of the duty which rests upon correctional authorities to provide new procedures consistent with the requirements of the Constitution. This case presents the unusual situation in which all parties and their respective counsel agreed that this mission was accomplished within the framework of this particular litigation.

We, of course added that "this Court is most grateful for the cooperation it has received and publicly commends the parties and their counsel for their contributions and assistance."[1]

The 1973 consent decree became effective precisely at the time the legal responsibility for the administration of the Jackson County Jail was shifted from the Sheriff of Jackson County, Missouri, to the new administrative officials authorized by the then recently adopted Jackson County Charter. The new administrative officials to be named under the Charter had been consulted during the course of the litigation and before the original consent decree was entered. Those new officials were therefore in a position to commence, and did promptly commence, the implementation of the substantial and fundamental changes required by the decree without delay.

While the physical location of the Jackson County Jail on the top floors of the forty year old Jackson County Court House and the outmoded architectural design of that facility present many problems almost incapable of solution, experience over the past four years under the original consent decree has established that the provisions

---

1. The public officials and counsel for the respective parties responsible for the original 1973 consent decree named in our original opinion were as follows:

 The Honorable George W. Lehr, Presiding Judge of Jackson County; the Honorable Harry Wiggins, Western Judge; and the Honorable Joseph J. Bolger, Eastern Judge; and Sheriff William Kenneth Carnes all approved, both individually and in their official capaci-

 ties, the consent judgment entered in this case. Those gentlemen and members of their respective staffs worked cooperatively with Ronald L. Roseman, Esq. and Allen M. Ressler, Esq., attorneys for the plaintiffs; and with Thomas J. Walsh, Esq., attorney for Sheriff Carnes and Herbert M. Kohn, Esq., Tom J. Helms, Esq., and Austin B. Speers, Esq., attorneys for the County Court, in a highly commendable manner.

and requirements of the 1973 decree have been effective in improving the operation and maintenance of that institution in a manner consistent with the requirements of the Constitution of the United States.

The parties to this action and their respective counsel, however, have commendably recognized that experience over the past four years has also established that there are areas of compliance with the 1973 consent decree, and particular modifications and changes in that decree which may be made, which will permit still further improvements under the circumstances.

When it became apparent that it might become necessary for counsel for plaintiffs to commence appropriate ancillary proceedings in this Court in regard to the enforcement of particular provisions of the original 1973 decree, counsel for the respective parties, in much the same manner as did counsel for the parties four years ago, initiated a series of conferences which enabled them to present the following joint motion to modify the 1973 consent judgment:

COME NOW the parties in the above-captioned cause, by and through their attorneys, and move the Court to enter an order for modification of a consent judgment heretofore entered by this Court on January 3, 1973.

1. That during the passage of time between the entry of the judgment on January 3, 1973 and the date of this motion a number of changes have taken place that affect the terms and conditions of the decree, and that, in the opinion of the parties, are of sufficient magnitude to warrant a request being presented to this Court to enter a modification of the original judgment to reflect such changes.

2. That as a consequence of the above the parties, by and through their representatives, have met and conferred, and as a result of such deliberations they have agreed upon a proposed amendment of the consent judgment to submit to this Court for the purpose of adoption and entry, if such meets with the approval of the Court; that a copy of the proposed

first amended consent judgment and appendix thereto is attached to this motion.

3. That the parties, by and through their respective attorneys and representatives, advise the Court that this proposed first amended consent judgment is based upon the afore-mentioned factual experience in operating the facility, that is the subject of the judgment, under the terms of said decree, upon investigations made by representatives of the parties at this facility, upon information obtained from authorities in the field of corrections and from other correctional institutions, and upon reports rendered upon the operations of this facility and other such correctional institutions; and that it is further submitted by the parties hereto, acting by and through their representatives, that the entry of the proposed modified judgment would be in the best interests of the respective parties and in the best interests of justice.

That joint motion presents for our approval a first amended consent judgment signed by Ronald L. Roseman, Esq., of the Legal Aid and Defender Society of Greater Kansas City (who has represented plaintiffs throughout the pendency of this case), by the Honorable Mike White, County Executive of Jackson County, Missouri; and by Willard B. Bunch, Esq., County Counselor of Jackson County, Missouri. The first amended consent judgment incorporates three separate memoranda of agreement which have been signed by Mr. Roseman, on behalf of the plaintiffs, and by Ms. Susan M. Stanton of the Office of the Department of Corrections of Jackson County, Missouri.

This Court is most grateful for the cooperation it has received from Mr. Roseman, Mr. White, Mr. Bunch and Ms. Stanton and for their constructive and highly commendable contribution to the administration of criminal justice by their representation of the first amended consent judgment.

### III.

We stated at the outset of our 1973 memorandum opinion approving the original consent judgment that we were directing

publication of that consent judgment and the rules and regulations hand-book which was a part of the judgment "because of the assistance this case may render other courts dealing with questions similar to those presented in this case." 365 F.Supp. 396.

We shall, of course, direct publication of the first amended consent judgment and of the three memoranda of agreement incorporated as a part thereof by reference. Mr. Roseman and Mr. Bunch, as counsel for the respective parties, and Mr. White and Ms. Stanton, as representatives of Jackson County, Missouri, should have the satisfaction of knowing that the publication of the first amended consent judgment will give other courts and other correctional administrators throughout the country not only the benefit of the experience gained in regard to the manner in which the Jackson County Jail was operated under the original consent judgment, but of perhaps greater importance, the benefit of the experience which supported the mutual desire of the parties to make modifications and amendments to the original decree which would further improve the operation and administration of the Jackson County Jail in accordance with constitutional standards.

Both the original consent judgment and the first amended consent judgment entered in this case should therefore be persuasive evidence to the reluctant that metropolitan jails can be maintained and operated in accordance with applicable constitutional standards under Court approved procedures devised by the parties and their counsel. It should help convince those who would deprive inmates of correctional institutions access to the judicial process that after the benefit of a few years experience of actual operation, the parties are able to suggest appropriate modifications and amendments designed to further improve the overall administration of the correctional institution involved. We reiterate our expression of appreciation to those responsible for the submission of the first amended consent judgment and again commend them for a job well done.

## IV.

In our memorandum opinion of January 3, 1973, approving the original consent judgment, we directed attention to particular provisions in which, so far as the reported cases then revealed, experimental provisions were introduced for the first time in that original judgment in regard to administrative review of inmate grievances, which were subject both to administrative appeal and to judicial review by the Circuit Court of the Sixteenth Judicial Circuit sitting in Kansas City, Missouri.

We did not deem it necessary to summarize other provisions of the original judgment for the reason that we directed that the entire decree and the Handbook be published in full. In the same manner, we shall direct publication of the first amended judgment and direct attention only to major innovative changes which have been agreed to by the parties.

Part I, Internal Administrative Procedures and General Provisions, Paragraph 15 reflects the commitment and binding obligation of the Department of Corrections in regard to training Correctional Officers and providing in-service training to the jail staff. The memorandum agreement attached as Exhibit B, incorporated by reference into the first amended consent judgment, reflects the recognition that a qualified Training Coordinator must be employed.

That memorandum agreement commendably recognizes the experience which reflected the failure of numerous good faith attempts to provide necessary and adequate training programs during the past four years. That experience teaches that those attempts were unsuccessful due to the lack of consistent coordination by a competent and qualified expert in the field. Persons so qualified are difficult to come by. For that reason the Court approved the timetable which permits employment of a Training Coordinator who meets the agreed job description not later than July 1, 1977. Implementation of the training program is therefore delayed until September 1, 1977.

Part V, entitled "Fact Finding Team for Compliance," is an entirely new section and reflects the willingness of the Community Relations Service (CRS) of the United States Department of Justice to assist the parties and the Court in assuring compliance with the first amended consent judgment. The Community Relations Service has agreed to provide regular service and assistance pursuant to the provisions of the 1964 Civil Rights Act, 42 U.S.C. § 2000g, until released by the Court. The Court is grateful to the Community Relations Service and to the United States Department of Justice for lending its good offices under the circumstances. Successful implementation of this new provision could establish a pattern of experience which may prove to be valuable in many other cases.

Part VI, relating to Inmate Security Provisions, is also a new section. That section is specifically patterned to deal with the continuing problems of improper architectural design and to reduce jail population by the implementation of an established screening unit whose primary function will be to divert eligible inmates from pretrial custody and to place sentenced inmates into appropriate, available, and established community-based programs rather than into jail custody. Hopefully, the effective implementation of these new provisions will reduce the jail population so that the housing of inmates in cells of limited visual access may be avoided.

Paragraph 5 of Part VI codifies the beneficial four year experience of the establishment and operation of the Inmate Council. That new paragraph provides that the Inmate Council shall be continued and that the Department of Corrections shall work with the Inmate Council to resolve matters beneficial both to the inmates and the administration.

Resolution of troublesome problems at that level by inmates and staff may eliminate the necessity of administrative review under the established grievance procedures, to say nothing of State court appellate review under the provisions of the Missouri Administrative Procedures Act and Article V, Section 22 of the Constitution of Missouri, V.A.M.S., and, hopefully, on a long term basis, the necessity for further exercise of federal court jurisdiction under the Constitution and laws of the United States.

## V.

For the reasons stated, it is

ORDERED (1) that the joint motion to modify consent judgment should be and the same is hereby granted. It is further

ORDERED (2) that the first amended consent judgment, together with the exhibits attached thereto and incorporated therein by reference, should be and the same are hereby approved and ordered entered as a final judgment and order of this Court. It is further

ORDERED (3) that this memorandum opinion, together with the first amended consent judgment and all its parts, should be and the same is hereby ordered to be submitted for publication in the Federal Supplement.

## FIRST AMENDED CONSENT JUDGMENT

Come now the parties hereto, by and through their attorneys of record, and advise the Court by way of motion that they are mutually desirous of modifying and amending the consent judgment heretofore entered by this Court on January 3, 1973 (*Goldsby v. Carnes,* 365 F.Supp. 395 (W.D. MO.1973) for the reasons stated in the motion, and for that reason defendants are willing to consent to the rendition and entry of the following judgment against them, the provisions of which, when fully implemented and complied with, shall be deemed to meet or exceed minimum constitutional standards regarding the operation and maintenance of the Jackson County Jail and any other similar detentional and correctional facilities which defendant Jackson County may in the future provide under the provisions of its charter.

Now, therefore, the Court being fully advised in the premises, having conferred with the parties and their attorneys herein,

having reviewed all aspects of this case to date, having fully considered the desirability of disposing of the litigation by means of amendment to the above-described judgment, knowing the same to be freely agreed to by defendants herein as is evidenced by their signatures hereto, and finding that the amendment of this judgment are fairly supported by factual agreement between the parties to this suit;

Does hereby order, adjudge, and decree that the following modified judgment, consisting of six parts and an appendix, be and the same is hereby rendered as the judgment of this Court against Jackson County Jail, County Department of Corrections, Jackson County, a political entity of the State of Missouri (the successor to Sheriff William Kenneth Carnes); the County Executive and County Legislature of Jackson County, a political subdivision of the State of Missouri (the successors to George W. Lehr, Harry Wiggins, and Joseph J. Bolger, Jr., Judges of the County Court), jointly and severally, and the employees, agents and successors of the named defendants in this action; to-wit:

## PART I

### INTERNAL ADMINISTRATIVE PROCEDURES AND GENERAL PROVISIONS

1. Jail authorities will exterminate the entire jail for insects and rodents at least once a week or as necessary to eliminate insects and rodents. Materials shall be rotated in accordance with acceptable practices of the profession. A professional exterminator will be called twice a year to evaluate the procedure.

2. Jail authorities will make mops, brooms, and cleaning supplies available in sufficient quantity and on a daily basis to inmates to insure that their living quarters can be maintained in a clean and safe condition. Jail authorities will have the areas behind the cells cleaned on a regular basis sufficient to eliminate the insect problem. Scouring cleanser and brushes will be issued to inmates daily for the cleaning of shower stalls.

3. A memorandum of agreement concerning sanitized mattresses will be entered into by April 1, 1977. If no agreement between the parties can be reached, the paragraph regarding mattresses as in *Goldsby v. Carnes,* 365 F.Supp. 395 at 401 paragraph 3 shall remain in full force and effect.

4. In hot weather, jail authorities will provide two large fans for each tank. One large fan for smaller units such as I, F, G, intake north and intake south, and one box fan for Y, M, & J sections. In addition there is a means to circulate the air for all living, program, and recreation areas. Jail authorities will continue to replace windows as they are broken, especially during the cold months.

5. Jail authorities will take necessary steps to repair any stopped-up or leaking plumbing immediately after learning of such condition. Water will be cut off only in cells which are flooded, and, in such cases, water will be provided for drinking at least every two hours and toilets will be flushed periodically during the day.

6. Standard bath-size towels will be provided to each inmate and sheets will be large enough to allow for shrinkage.

7. Each inmate will be afforded an opportunity to shower at least every other day.

8. All new inmates in the Jail will be provided with underwear and clothing by jail authorities.

9. Each inmate without such shall be furnished with soap, a toothbrush, toothpaste, and shaving gear in sufficient quantity to allow adequate maintenance of personal hygiene.

10. All jail clothing shall be laundered at least five times a week.

11. Inmates shall be permitted to exercise for at least two hours a week, one hour of which shall be outdoors, weather permitting. (The recreation program will be expanded in accordance with the memorandum of agreement, attached as defendants Exhibit A, Part I, No. 11, Recreation).

12. Classification procedures shall be continued, and inmates shall be classified according to age, offense, physical aggressiveness, or other criteria which would warrant separate housing arrangements.

13. The work-study release program, particularly for sentenced inmates, shall be continued.

14. The Program Services Unit shall continue group and individual counseling program, and ensure an increase in remedial and basic educational and religious programs.

15. The Department of Corrections will train Correctional Officers and provide in-service training to jail staff. Orientation for new personnel shall consist of 40 hours of training, an additional 40 hours shall be provided during the first six months of employment and 40 hours annually thereafter. At a minimum, training shall consist of orientation, basic supervision, and interpersonal relationships, emphasizing psychology of adolescence and personal adjustment, abnormal psychology, stress negotiations and inter-group conflict and prejudices. (The training program shall be implemented as outlined in the memorandum of agreement, attached as the defendants Exhibit B, Part I, No. 15, Training).

16. Each inmate shall be provided with a copy of the General Information—Procedures & Rules sheet, which is a summary listing of all institutional rules and regulations. In addition, each living area shall receive a copy of the Inmate Manual, which is a complete listing of all institutional rules and regulations as it pertains directly to the inmates. The manual shall also set forth hearing procedures and the sanctions which may be imposed for each infraction or class of infraction. An inmate may be disciplined only for violations of rules listed in the manual and for no other reason. No sanctions other than those listed in the manual shall be imposed.

17. Any inmate accused of violating an inmate conduct regulation as set forth in the General Information—Procedures & Rules sheet and Inmate Manual, which includes the sanctions, shall be afforded the following procedures before imposition of any sanction:

a. The inmate shall have written notice of the specific charges against him within 24 hours of the offense, excluding weekends and holidays.

b. The inmate shall have the opportunity to present his case of major prohibited acts before an impartial committee, which shall consist of three staff, none of whom were involved in the incident or the investigation thereof. The chairmen of committee shall be in a supervisory position.

c. The hearing shall be held within 72 hours (excluding weekends and holidays) of the alleged incident, and the inmate shall be afforded a 48 hour extension, if requested to prepare his case.

d. The inmate shall be afforded the opportunity to call a reasonable number of witnesses in his own behalf. An inmate may have the opportunity to confront his accusor and cross examine opposing witnesses unless the inmate accusor believes that there is a threat of serious physical harm to him. Upon the inmate accusor's request, the Disciplinary Committee may then refuse to allow this inmate to appear in person at the hearing. If the inmate accusor is not allowed at the hearing, the Disciplinary Committee shall document in writing the reason for this refusal and the inmate charged with the disciplinary offense shall be afforded all written reports and statements concerning the charge against him so he may refute said evidence necessary.

e. The committee shall privately review the testimony. Any finding of guilt shall be predicated upon a finding that there is substantial reason to believe that the inmate has committed the alleged infraction.

f. A written record of the committee's findings and conclusions and testimony in support thereof shall be maintained for at least one year.

g. There shall be a right to appeal to the Director of the Department of Corrections; in no case may any sanction im-

posed by the tribunal be increased upon or after review.

h. Appeals from any final decision of the Director of Corrections shall be to the Circuit Court of the Sixteenth Judicial Circuit in accordance with the provisions of the Missouri A.P.A., Chapter 536 of the Revised Statutes of the State of Missouri and Article V, Section 22 of the Missouri Constitution.

i. Any inmate who has allegedly committed an act that is in violation of the rules of this department and is so charged may be placed immediately in administrative separation but no longer than 72 hours, pending a determination by the disciplinary committee. Administrative separation is to be used only for offenses that place the inmate in danger to himself or others, or his acts may or will lead to the destruction of property.

j. Minor Dispositions—The Director of the Department of Corrections shall delegate to such persons (hearing officer) he selects, the authority to impose dispositions and sanctions for violations of minor institution rules or regulations. Minor dispositions and sanctions are those actions where the sanctions are loss of one or more of the following: visiting, commissary, program activities such as recreation, classes, etc., for a period of no greater than 14 days.

1) Each inmate charged with violating an institution rule or regulation shall be given a written copy of the charge or charges against him within 24 hours of the infraction.

2) Each inmate so charged will be entitled to a hearing before the hearing officer held within 72 hours (excluding weekends and holidays) to present evidence.

The inmate will be given a written copy of the decision and disposition. Review of any action taken as a minor disposition will be pursuant to the review by the Director when so requested by the inmate. The Director may either turn down the appeal or convene a disciplinary committee for a hearing.

18. If an inmate is charged with a violation that could also be prosecuted in state or federal court, he shall be advised that his case may be referred to the prosecuting attorney; that he has the right to remain silent; that anything he says can and may be used against him at a subsequent trial; that he has the right to counsel; and that if he cannot afford counsel, one will be provided at no expense to him. If a case is referred to the prosecuting attorney for prosecution, internal disciplinary action may still proceed.

19. There shall be no discipline of an entire group of inmates unless it is determined that all the inmates to be disciplined participated in the wrongful act (except in quelling riots, mass destruction of property, or other mob activity). The jail shall make an attempt to remove non-participants in the event of mob activity.

20. An inmate in separation and who has lost privileges, shall receive all the hygienic articles necessary to keep himself and his cell in a clean condition; shall receive the same food, and mattresses afforded other inmates, unless the health service unit staff certifies in writing that such items are or may be harmful to the health or safety of the inmate. Inmates may not be denied access to shower, shave, court, mail, professional visits, telephone calls relating to their case, or necessary personal hygiene articles. Separation to maximum security requires assignment to a single cell and possible loss of all privileges except those items listed above. The loss of commissary and visiting shall not exceed 30 days. Inmates in separation may be allowed to use the recreation area once a week after they are in separation for over 14 days. Inmates in separation shall be seen by a member of the Health Service Unit staff and caseworker at least once a day, and shall be allowed to exercise outside their cells daily.

21. Inmates can subscribe and receive books, magazines, and periodicals. Books, magazines, and periodicals can be denied an inmate only if the publication poses a direct, clear, and immediate danger to the

378

security of the institution or if the publication is obscene as a matter of law.

22. When a publication is withheld from an inmate due to the obscenity of the publication or they believe the publication poses a direct, clear, and immediate danger to the institution, an inmate shall then receive:

a. notice that the publication is being withheld,

b. some opportunity for the inmate either in writing or personally to object,

c. and a decision by a body that can be expected to act fairly and in accordance with the test laid out in these regulations.

23. No restrictions shall be placed on the identity of correspondents, on the number of correspondents, on the number of letters an inmate may send or receive, or on the length of letters.

24. All outgoing mail shall be sealed by the sender and placed in a departmental mailbox from which mail is delivered direct to the United States carrier.

25. Outgoing mail shall not be inspected, censored, delayed, or otherwise interfered with.

26. Letters may be typed or handwritten.

27. Incoming mail from attorneys, courts, Governor of the State of Missouri, member of the United States Congress, and the House and Senate of the State of Missouri, shall remain sealed and be delivered to the inmate addressee. Such mail may be opened in the presence of the inmate to check for contraband.

28. All incoming mail, other than listed in paragraph 27 above, shall be opened in the presence of the inmate addressee if the letter indicates on its face that it is to be opened in the presence of the addressee. All other incoming mail may be opened only for the purpose of inspecting for contraband and afterwards be delivered directly and immediately to the addressee.

29. Incoming and outgoing letters may be in any language.

30. If the inmate so requests, incoming and outgoing mail to and from the parties listed in paragraph 27 will be recorded in a central "official correspondence log."

31. Inmates may receive paperback books and similar legal materials subject only to regulations concerning obscenity and threats to the security of the institution.

32. Inmates' subscriptions to newspapers, magazines, and other periodicals, in any language, shall be permitted without restriction unless said publications have been judicially determined to be obscene under applicable constitutional standards, or otherwise violative of the federal postal laws.

33. The institution shall provide when requested once a week, indigent inmates with 2 pre-stamped legal envelopes, 4 sheets legal size paper, 2 pre-stamped letter envelopes, and 4 sheets letter size paper, and pen. If additional writing supplies are needed for contacting the courts, lawyers or Governor, requests shall be placed through the caseworkers who will see that the additional materials are available. An indigent inmate is one who has no money or means of support.

34. The institution shall provide free notary service to all inmates, with notarization to take place in the presence of the inmate.

35. There shall be no additional restrictions on inmate correspondence for disciplinary, punishment, or any other reasons unless his correspondence has violated rules as to contraband; and then upon a proper showing of the alleged violation, his mail may be restricted, but this shall not apply to any restriction of attorney-client mail or court correspondence.

36. Inmates shall be allowed at least two telephone calls per week. Each such call shall be allowed for a period of at least three minutes.

37. Visits shall be allowed on a weekly basis. Children, accompanied by an adult, shall be allowed entry for visitation. Every effort shall be made to increase visitation privileges to at least twice a week.

38. Attorneys may see their clients Monday through Friday from 8:00 a. m. to 11:00 a. m. and 1:00 p. m. to 4:00 p. m., Saturday from 8:00 a. m. to 10:30 a. m. All other times can be prearranged with the Shift Administrator. All efforts will be made to insure that the attorney will be able to see his client when necessary regardless of the time period.

39. Attorneys may request a private consultation room in order to confer with their clients, and such areas will be provided.

40. Private consultation rooms for attorney visits shall be maintained. These rooms shall be free of both auditory and visual intrusion, except for one small look-through glass panel.

## PART II

### DIET AND FOOD PREPARATION

1. There shall be a Food Service Manager who is in charge of food service. This person shall have technical training and experience in food service. This person must have management skills and be given direct authority over the kitchen operation.

2. A dietitian should approve the menus. The menu shall be planned to assure that the diet is properly administered and that proper food techniques are followed.

3. The menu shall include the recommended dietary allowance for food nutrients specified by the National Academy of Science, Food and Nutrition Board. These standards can be met for the adult inmates by following these recommendations. The daily diet must include: 1 serving of milk or cheese, 2 or more servings of meat, fish, poultry, eggs, or legumes, 2 servings of fruits and vegetables, and 2 or more servings of breads and cereals.

4. Any diet prescribed by a physician must be provided for the patient. The foods allowed and not allowed for a prescribed diet must be authorized by either a registered dietitian or a physician. All diabetics must have a diet according to the above format (The Basic Four) unless further requirements are ordered by the physician.

5. A record giving the name of the person and the diet he is on must be available for the cooks at all times as well as those serving the modified diets. A list of foods allowed for each of the prescribed diets must also be available for the cooks at all times.

6. In order for storage facilities to meet minimum specifications, the following must be done:

a. All food items must be covered securely.

b. All food containers containing food must be placed on racks off the floor.

7. There must be a system for the rotation of supplies so that old stock is used first.

8. Food shall not be allowed to sit at room temperature and must be covered while being transported to the living areas.

9. Prisoners being isolated for screening of infectious diseases, such as malaria, must be allowed to serve themselves, and they must be served with disposable utensils. Disposable utensils may be used only one time.

10. The jail kitchen must be maintained in a safe and sanitary condition. To insure that this objective is met, the following shall be done:

a. There must be a cleaning schedule for all equipment in addition to the floor, walls and vents.

b. The Jackson County Health Department should conduct periodic inspections of the kitchen facilities to insure that the kitchen meets health and sanitary requirements established for food services that operate within the County.

c. Eating utensils must be made to withstand temperatures to 170° or more in order for them to be sanitized. In the alternative, plastic disposable spoons may be used for each individual meal.

d. Kitchen equipment must be operational and safe for use, and must be adequate to prepare food.

e. Food carts will be provided that contain adequate heating units to insure that hot food is served at the proper temperature. (A method to maintain food at proper serving temperature will be determined as outlined in the attached memorandum of agreement, attached as defendants Exhibit C, Part III, No. 10e, Food Carts).

## PART III

### LAW LIBRARY

There will be a law library maintained and provided for inmates which, in addition to the following books, shall also have available an adequate supply of legal size stationery and two manual typewriters in good working order:

1. Volumes 38, 39, 40 & 41 V.A.M.S.
2. Missouri Rules of Court Pamphlet
3. Vernon's Annotated Missouri Rules (Rules 1–102 in Four Volumes)
4. Southwestern Reporter—Missouri Cases Only (last 10 years to date)
5. Black's Law Dictionary
6. Missouri Digest (1 set)
7. Titles 18 and 28, United States Code Annotated
8. Federal Practice & Procedure by Wright & Miller Volumes 1–3 only
9. Supreme Court Reporter (1953 to date)
10. Corpus Juris Secundum—Criminal Law Sections only (7 volumes)
11. Federal Rules of Criminal Procedures Pamphlet
12. Missouri Revised Statutes plus yearly supplements (1969 Ed.)

The foregoing legal works shall be kept current yearly and supplements thereto shall be purchased when issued by the publishers.

## PART IV

### MEDICAL AND DENTAL

1. There shall be a Unit Manager of the Health Service Unit who shall oversee and be responsible for the overall health care program at the jail. The medical facilities at this institution consist of a complete infirmary which is a direct affiliation with a hospital. The infirmary is staffed by a physician (part time) and Paramedic Technician, 24 hours a day, seven days a week.

2. There shall be sufficient examining room and short term examining room and short term observation rooms in order to provide adequate primary medical care.

3. A uniform system of medical records shall be maintained on each inmate who enters the jail for documenting initial health status of inmates, plans, if any, for diagnosis and treatment, and their outcome (followup) when instituted for any reason by the medical staff participating in inmate care.

4. A structured system for pharmacy storage and distribution shall be established in accord with the medically recognized standards in pharmacy service. Medications will be delivered daily from the hospital. Only limited amounts of medications are to be kept in the jail.

5. At no time are inmates to assist in dispensing medications.

6. Each inmate upon entering the jail shall have his medical history taken and then be given a screening and physical examination by medical personnel, under the supervision of a physician, and shall have any laboratory test made that may be necessary.

7. No inmate shall be denied the privilege of seeing the physician, except with the concurrence of the Unit Manager of the Health Service Unit.

8. A member of the medical team shall visit each housing unit daily at regular preset times to evaluate complaints, perform medical counseling, and schedule follow-up appointments. Each request for medical treatment, whether written or oral, shall be followed up without fail.

9. There shall be sufficient medical staff to provide a M.D. or D.O., for sick call, twice a week. There shall be sufficient paramedical technicians to provide medical coverage 24 hours a day, 7 days a week.

10. Any follow-up appointments with doctors made for inmates either while the inmate is at General Hospital or in the jail shall be kept. If for some reason these appointments cannot be kept, it is the health service's responsibility to arrange for a new appointment with the respective doctor, and the jail's responsibility to insure that this appointment is kept.

11. As part of the training program, the department shall train jail personnel to recognize acute and/or chronic illness.

12. All departmental staff shall work closely with the Health Service Unit. All staff shall refer inmates with suspected psychiatric and/or psychological problems to the departmental psychiatrist.

13. Dental Care shall be provided that will insure good dental care to relieve pain, eliminate infection, and the preservation of viable teeth.

## PART V

## FACT FINDING TEAM FOR COMPLIANCE

1. The parties to this action and this Court having requested the Community Relations Service (CRS) of the U.S. Department of Justice to assist the parties and the Court in assuring compliance with this Order, and CRS having agreed to provide such assistance pursuant to the provisions of Title X of the 1964 Civil Rights Act, 42 U.S.C. Sec. 2000g, it is agreed that:

a. CRS will serve as a fact-finder for the parties and the Court with respect to the extent of compliance with this Order. In partial discharge of this responsibility, CRS will, within 60 days from the date of this Order file with this Court and with all counsel a written report of their findings bearing on the extent of compliance. CRS will make supplementary reports of the same nature at three-month intervals for one year thereafter, and make two more reports at six-month intervals for the second year. CRS may at its discretion make more frequent reports to the Court depending upon need.

b. CRS, as fact-finder, may at reasonable times inspect jail facilities, interview inmates and county employees, inspect institutional records, and obtain other relevant information from the parties. The parties will honor and comply with other reasonable requests from CRS for information needed to document the extent of compliance.

c. CRS, in its discretion as fact-finder, may engage the services of and consult with appropriate independent specialists who shall be compensated by Jackson County, and may, further, subject to the approval of this Court, engage the services of other U.S. Justice Department personnel. Whenever the County is to compensate the specialist, the County must be notified two weeks in advance so that a contract may be issued.

d. After the second year of operation the parties may decide on another fact-finding team to fulfill the above obligations (see a, b, and c above) and to report on compliance with the Order. The parties may ask CRS to continue this responsibility.

2. Both parties agree that this fact-finding team shall continue until the Court agrees to release all parties from this responsibility. If a new fact-finding team is to be utilized, it should not differ substantially from the procedure outlined above.

## PART VI

## INMATE SECURITY PROVISIONS

1. Inmates assigned to tanks will be locked in their cells every night at 10:00 p. m. and remain in their cells until breakfast. Headcounts, i.e. visual checks, will be made at 10:00 p. m. to assure that inmates are in the proper cell and again prior to breakfast so that any problems in a tank may be isolated to a cell during this time.

2. Living units should be observed at least every 30 minutes, 24 hours a day. In addition, cells in a tank should be visually checked four times while inmates are secured in their cells (10:00 p. m. until break-

fast), and these checks should be recorded in the floor log book.

3. All living units should be checked for contraband at least once a month.

4. All new inmates will be assigned to a single cell for at least 48 hours until the classification committee can make a living unit assignment. Efforts should be made to keep an inmate in a single cell as long as possible. Juveniles will be housed in living areas separate from adults.

5. The Inmate Council shall be continued. The Department of Corrections shall work with the Inmate Council to resolve matters beneficial to both the inmates and administration.

6. The Department of Corrections shall operate a screening unit whose primary function is to divert eligible inmates from pretrial custody and to place sentenced inmates into appropriate and available programs such as Pre-Trial Diversion, McCoy House, T.A.S.C., Project Option, Release on Recognizance, and New Horizons.

7. Whenever the jail population permits, the last cell in a tank, due to limited visual access, shall be closed to the housing of inmates.

## APPENDIX

That the appendix heretofore appended to the original consent judgment (365 F.Supp. at 407–416) is hereby deleted, and the following appendix substituted therefore.

### I

*Disciplinary Procedures*

The disciplinary procedures are as outlined in the body of the Consent Judgment in Part I, items 17–20.

The prohibited acts and sanctions are as follows:

## PROHIBITED ACTS AND SANCTIONS

1. Prohibited Acts:

 a. Major

 001 Killing

 002 Assaulting any person

 003 Fighting with another person

 004 Threatening another with bodily harm, or with any offense against his person or his property

 005 Extortion, blackmail, protection: demanding or receiving money or any thing of value in return for protection against others, to avoid bodily harm, or under threat of informing

 006 Escape

 007 Attempting or planning escape

 008 Setting a fire

 009 Destroying, altering, or damaging county property, or the property of another person

 010 Stealing (theft)

 011 Tampering with or blocking any locking device

 012 Possession or introduction of an explosive or any ammunition

 013 Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, or unauthorized tool

 014 Possession, introduction, or use of any narcotics, narcotic paraphernalia, drugs, or intoxicants not prescribed for the individual by the medical staff

015 Possessing any officer's or staff clothing

016 Mutilating or altering clothing issued by the county

017 Rioting

018 Encouraging others to riot

019 Engaging in, or encouraging, a group demonstration

020 Refusing to obey an order of any staff member

021 Violating a condition of furlough

022 Conduct which disrupts or interferes with the security or orderly running of the institution

023 Counterfeiting, forging, or unauthorized reproduction of any document, article of identification, money, security, or official paper

024 Failure to return to confinement (Release Program)

025 Running from a correctional officer

026 Threatening an employee of the Department of Corrections or County

027 Refusing to go or come from a cell or other area

028 Creating a disturbance in a housing unit

029 Attempting to interfere or interfering with the rights or privileges of other inmates

030 Taking and/or holding hostages

031 Attempting to commit any of the above offenses, aiding another person to commit any of the above offenses, and making plans to commit any of the above offenses shall be considered the same as a commission of the offense itself

032 Engaging in sexual acts with others

033 Making sexual proposals or threats to another

034 Possession of any thing not authorized for retention or receipt by the inmate, and not issued to him through regular institutional channels

035 Being in an unauthorized area

036 Giving or offering any official or staff member a bribe, or any thing of value

037 Giving money or any thing of value to, or accepting money or any thing of value from: another inmate, a member of his family, or his friend

038 Possession of needle or syringes (including homemade)

039 Possession of or smoking marijuana

040 Refusing to work, or to accept a program assignment

041 Encouraging others to refuse to work or participate in work stoppage

042 Unexcused absence from work, or any assignment

043 Failing to perform work as instructed by a supervisor

b. Minor

044 Indecent exposure

045 Wearing a disguise or mask

046 Adulteration of any food or drink

047 Misuse of authorized medication

048 Possession of property belonging to another person

049 Malingering, feigning an illness

050 Participating in an unauthorized meeting or gathering

051 Failure to follow safety or sanitation regulations

052 Using any equipment or machinery which is not specifically authorized

053 Using any equipment or machinery contrary to instructions or posted safety standards

054 Failing to stand count

055 Interfering with the taking of count

056 Making intoxicants

057 Being intoxicated

058 Unauthorized use of mail or telephone

059 Unauthorized contacts with the public

060 Correspondence or conduct with a visitor in violation of posted regulations

061 The unauthorized taking of extra portions of food

062 Unauthorized food in cell area

063 Spitting or throwing any substance or object on or at a corrections officer, employee of the County, or others authorized to work within the Department of Corrections

064 Possession of money or currency, unless specifically authorized

065 Loaning of property or anything of value for profit or increased return

066 Possessing unauthorized clothing

067 Insolence towards a staff member

068 Lying or providing a false statement to a staff member

069 Smoking where prohibited

070 Using abusive or obscene language

071 Preparing or conducting a gambling pool

072 Possession of gambling paraphernalia

073 Using unsanitary or untidy: failing to keep one's person and one's quarters in accordance with posted standards

074 Tatooing or self-mutilation

2. Maximum Sanctions: Any inmate found guilty of violating a department rule or regulation may receive sanctions imposed by the

Department of Corrections Disciplinary Policy. The following are maximum sanctions which the disciplinary committee may impose for each violation.

a. <u>Major</u>

001 Judicial Prosecution—separation from general population. Maximum security until removed from Department of Corrections

002 Judicial Prosecution—separation from general population, 30 days maximum security

003 Separation from general population, 30 days maximum security

004 Separation from general population, 30 days maximum security

005 Judicial Prosecution—separation from general population, 30 days maximum security

006 Judicial Prosecution—separation to maximum security until removed from Department of Corrections

007 Judicial Prosecution—separation to maximum security until removed from Department of Corrections

008 Judicial Prosecution—suspension of all privileges for 30 days

009 Judicial Prosecution—Restitution—suspension of specific privileges for 30 days

010 Judicial Prosecution—separation to maximum security for 15 days

011 Judicial Prosecution—separation to maximum security for 30 days

012 Judicial Prosecution—separation to maximum security for 30 days

013 Judicial Prosecution—separation to maximum security for 30 days

014 Judicial Prosecution—Separation, maximum security for 30 days

015 Separation, maximum security for 30 days

016 Judicial Prosecution—Restitution—suspension of all privileges for 30 days

017 Judicial Prosecution—separation, maximum security until removed from Department of Corrections

018 Judicial Prosecution—separation, maximum security until removed from Department of Corrections

019 Separation, maximum security for 30 days

020 Separation, maximum security for 30 days

021 Judicial Prosecution—suspension of specific privileges for 30 days

022 Separation, maximum security for 30 days

023 Judicial Prosecution—suspension of all privileges for 30 days

024 Judicial Prosecution—removal from program; loss of all privileges for 30 days

025 Judicial Prosecution—separation, maximum security for 30 days

026 Judicial Prosecution—suspension of all privileges for 30 days

027 Judicial Prosecution—suspension of all privileges for 30 days

028 Separation, maximum security for 30 days

029 Separation, maximum security for 30 days

030 Judicial Prosecution—separation, maximum security until removed from Department of Corrections

031 Any violation of Federal, State, County, or City laws may cause violator to be prosecuted

032 Judicial Prosecution—separation from general population. Maximum security until removed from Department of Corrections

033 Separation, maximum security for 30 days

034 Separation, maximum security for 30 days

035 Separation, maximum security for 30 days

036 Judicial Prosecution—separation, maximum security for 30 days

037 Judicial Prosecution—separation, maximum security for 30 days

038 Separation, maximum security for 30 days

039 Separation, maximum security for 30 days

040 Removal from program and transfer to general population

041 Removal from program and transfer to general population

042 Removal from program; transfer to general population; suspension of all privileges for 14 days

043 Removal from program; transfer to general population

b. Minor—Listed below are maximum sanctions which the hearing officer may impose for each violation. Privileges which may be taken away are visiting, commissary, program activities such as recreation, classes, etc. for a period of no greater than 14 days.

044 Suspension of specific privileges for 14 days

045 Suspension of all privileges for 14 days

046 Suspension of specific privileges for 14 days

047 Suspension of specific privileges for 14 days

048 Suspension of specific privileges for 14 days

049 Suspension of specific privileges for 14 days

050 Suspension of all privileges for 14 days

051 Suspension of all privileges for 14 days
052 Suspension of all privileges for 14 days
053 Suspension of all privileges for 14 days
054 Suspension of all privileges for 14 days
055 Suspension of all privileges for 14 days
056 Suspension of all privileges for 14 days
057 Suspension of all privileges for 14 days
058 Suspension of specific privileges for 14 days
059 Suspension of specific privileges for 14 days
060 Suspension of specific privileges for 14 days
061 Suspension of specific privileges for 14 days
062 Suspension of specific privileges for 14 days
063 Suspension of specific privileges for 14 days
064 Suspension of specific privileges for 14 days
065 Suspension of specific privileges for 14 days
066 Suspension of specific privileges for 14 days
067 Suspension of specific privileges for 14 days
068 Suspension of specific privileges for 14 days
069 Suspension of specific privileges for 7 days
070 Suspension of specific privileges for 7 days
071 Suspension of specific privileges for 7 days
072 Suspension of specific privileges for 7 days
073 Suspension of specific privileges for 7 days
074 Suspension of specific privileges for 7 days

## II

### Communications

#### Mail and Receipt of Publications

Mail and Receipt of Publications are provided for in Part I, items 21–33 in the Consent Judgment.

#### Telephone Privileges

1. Upon being incarcerated and upon completion of admittance paperwork, the duty Correctional Officer will permit the inmate to complete a telephone call to the person of his choice, such as an attorney, bondsman, relative or a friend. If the inmate is unable to complete his call satisfactorily (the person is absent, etc.), the Correctional Officer shall permit a second call to a different person, or even a third in an unusual circumstance. Two calls a week shall be made from the living area hereafter.

2. Officers will not permit inmates to take incoming calls. Officers may not take down and refer personal incoming messages for inmates unless in emergencies. Calls from attorney, bondsman, other officer, etc., where the information is of an official nature, such as a change in court date may be relayed to the inmate.

3. The Correctional staff may exercise a certain degree of latitude in unusual cases, such as a telephone call concerning a death in the family or other unusual circumstances. Under no circumstances are such calls to be made or received without one officer present.

4. A schedule for the rotation of phones will be placed in each living area. ˙

5. Each such call shall be for a period of at least three minutes. Correctional Officers will not talk over the telephone for inmates. The Correctional Officer may dial the calls for inmates, but will not monitor the conversation.

6. Under unusual circumstances, should the inmate be combative, intoxicated, drugged, mentally unable to function properly, or in any other way incapable of normal function at the time of incarceration, he may be incarcerated without calling providing that relief officers are clearly advised of this in writing so that the person may call when his situation improves.

## III

Inmate Hygiene, Recreation and Medical Services are provided for in Part I and Part IV of the Consent Judgment.

## IV
### Family Visiting

1. Inmates will receive not more than three visitors on any given day.

2. Inmates may receive visits between the hours posted as official visiting hours.

3. Visits will be limited to 30 minutes duration in usual cases and not over one hour in any case in order to allow all inmates to receive their visitors. .

4. Visitor's Register
 a. Persons wishing to visit with an adult or juvenile inmate must be on the inmates visiting list. This is to be verified by identification.

5. Visitors subject to search
 a. Officers are to search any person they have probable cause to feel are carrying contraband or may have a weapon. Visitors refusing to be searched are to be immediately removed from the jail.

6. Conduct of Visitors
 a. Visitors in the jail must conduct themselves in an orderly manner.
 b. Any visitor using loud and/or profane language, becoming hostile or combative, abusive toward other visitors or officer, failing to obey instructions or in any way conducting themselves in a manner tending to upset the normal routine are to be expelled from the jail and if the situation warrants, prohibited from visits.

7. Visitors shall be allowed on a weekly basis. Children, accompanied by an adult, shall be allowed entry for visitation. Every effort shall be made to increase visitation privileges to at least twice a week.

### Attorney Visiting

1. Attorneys may see their clients Monday through Friday from 8:00 a. m. to 11:00 a. m. and 1:00 p. m. to 4:00 p. m., Saturday from 8:00 a. m. to 10:30 a. m. All other times can be prearranged with the Shift Administrator. All efforts will be made to insure that the attorney will be able to see his client when necessary regardless of the time period.

2. Attorneys may request a private consultation room in order to confer with their clients and such an area will be provided.

3. Private consultation rooms for attorney visits shall be maintained. These rooms shall be free of both auditory and visual intrusion, except for one small look-through glass panel.

## V
### Commissary

Inmates shall be allowed to order commissary items two days a week, unless they are on restrictions.

## VI
### Religion

1. If the institution contains a reasonable number of inmates of the same religion, a qualified representation of that religion shall be appointed or approved by the Director of Corrections. If the number of inmates justifies it and conditions permit, the arrangement should be on a full-time basis.

2. A qualified representative appointed or approved under paragraph (1) shall be allowed to hold regular services and to pay pastoral visits in private to inmates at proper times.

3. Access to a qualified representative of any established religion shall not be refused to any inmate during scheduled professional visits. On the other hand, if any inmate should object to a visit of any religious representative, his attitude shall be fully respected.

4. So far as practicable, every inmate shall be allowed to satisfy the needs of his religious life by attending the services provided in the institution and having in his possession the books of religious observance and instruction of his denomination or beliefs. While in punitive separation he will be permitted to see his religious advisor and have in his possession his books of religious instruction.

## VII
### Social Services

1. Crisis counseling—The Department of Corrections shall have at least three caseworker positions who are responsible for crisis intervention, classification recommendations and short term casework. These caseworkers as well as other staff, shall refer inmates to the departmental psychiatrist, group counseling, AA counseling, drug counseling, or other programs as needed.

2. Work/Educational Release Program—The Department of Corrections shall continue to operate a work/educational release program. All sentenced offenders, plus others, are screened for the program with final determination to be made by the courts. Those individuals accepted into the program are tested to be placed on the proper work or educational setting.

3. Employment referral information will be available to inmates upon release when such is requested.

4. Limited group programs will be carried on in the jail when time and resources are available and when the administration can identify a group that can profit from a particular program.

## VIII
### Amendments

These rules and regulations may be amended, supplemented or changed from time to time as need arises, provided, however, that no changes be made contrary to the provisions of the Consent Decree entered and rendered December 29, 1972, in the case of *Goldsby v. Carnes et al.,* No. 20122–1, United States District Court for the Western District of Missouri.

Agreed as to substance and form
So ordered.

## MEMORANDUM OF AGREEMENT
### GOLDSBY vs. CARNES
### EXHIBIT "A"—PART I, NO. 11—RECREATION

At the present time the Department of Corrections offers the following equipment to the inmates: 21 position weight machine; 1 speed punching bag, 1 punching bag, 2 pair gloves for the above bags, 2 ping pong tables, 1 pool table, 1 air hockey table, mats for use in tumbling, boxing and gymnastics; basketball goal and backboard.

Recreation Tournaments/Intramurals— The Department of Corrections will sponsor at least eight organized recreation tournaments/intramural activities a year. These activities will provide for competition within each living unit and then competition within the institution. The winners of the tournaments will be awarded prizes.

The Department of Corrections will utilize the roof outdoor recreation at least one hour a week during the summer months, weather permitting. Due to the limited space and low fenced roof, activities will be limited to such sports as soccer, wiffle ball, horse shoes, frisbee, etc. If the inmates are receptive to the roof activities, the outdoor recreation will be for two hours a week.

Due to personnel changes the recreation unit has not been fully staffed, but will be

by 3/28/77. The Department of Corrections is concerned enough about the recreation and other programs, that a Program Supervisory position was created in addition to the administrative position.

The Administrator for the programs is new in his position, and is looking for ways to expand the programs. He has contacted the Missouri Department of Corrections, Kansas State Penitentiary, Leavenworth Penitentiary, UMKC Athletic Department, Jackson County Parks & Recreation Department, and National Correctional Recreation Association in an effort to learn more, to expand our recreational programs. He will continue to find methods to improve the recreational programs.

## MEMORANDUM OF AGREEMENT
### GOLDSBY vs. CARNES 3/10/77
### EXHIBIT B: PART I, NO. 15 TRAINING

The Department of Corrections will employ a Training Coordinator as outlined on the attached job description. We anticipate that it will take three to four months to employ someone qualified to fill the position.

The Department of Corrections has already started to develop a training curriculum. Courses include basic english/report writing; firearms; transportation/courtroom demeanor; personal appearance; physical fitness/self-defense (how to control someone without hurting the individual); interpersonal relationships; supervisor; prepromotional training; and orientation. These courses are being developed with assistance from the Regional Center for Criminal Justice.

The unit on interpersonal relationships will contain courses involving transactional analysis and reality therapy; problem solving—SOCS (Situation, Options, Consequences, Solutions); psychology of personal adjustment; applied psychology, social psychology; psychology of adolescence; abnormal psychology; intergroup conflict and prejudices; stress negotiations; and social problems. In this area we hope to be able to use materials already developed by the Regional Center and adapt them to our needs.

Orientation (Basic Training) for new personnel shall consist of 40 hours of training, an additional 40 hours (Intermediate Training) shall be provided during the first six months (the employee's probationary period) and 40 hours (Advanced Training) annually thereafter.

The Department of Corrections has attempted to start training programs many times during the past four years. All the attempts have been unsuccessful, due to no one qualified to coordinate the activities. The employment of the training coordinator shall allow the training program to progress.

## TIME TABLE

The Department of Corrections shall employ a Training Coordinator by 7/1/77.

During the employment search for a Training Coordinator, the Department of Corrections will continue to develop course curriculum.

After the Training Coordinator has been employed, the training program shall be implemented by 9/1/77.

Also, after the Training Coordinator has been employed, 20 hours of orientation will be implemented by 8/15/77. (See Attached page for course outline).

## ORIENTATION (BASIC) TRAINING—40 HOURS

| | |
|---|---|
| Institution Familiarity | 4 hours |
| Policy and Philosophy of Department of Corrections | 4 hours |
| Basic Security | 8 hours |
| Key Control, tools, use of restraints, searches, preservation of evidence, etc. | |
| Interpersonal Relationship | 8 hours |
| basic techniques—principles of dealing with people and listening | |

Basic English/Report Writing 8 hours

Self-Defense—restraining reasonable amount of force 4 hours

Institutional programs 2 hours

Prisoner Rights—Legal Authority to detain people 2 hours

## INTERMEDIATE TRAINING—40 HOURS

Interpersonal Communications 24 hours
 built on first course role playing—
 explain techniques

Policy and Philosophy 8 hours
 review and further development

Basic English/Report Writing 4 hours
 develop situations for writing reports

Discipline Procedures 4 hours
 Classification Procedures
 Institutional Program

## ADVANCE TRAINING—40 HOURS

\* Transportation/Courtroom demeanor 16 hours

Interpersonal Skills (review) 16 hours

\* Firearms training 8 hours

Review of Corrections Philosophy 8 hours
 trends
 rights of officer and inmates

Role of Criminal Justice System 8 hours
 Speakers to include: Probation; Public
 Defender; Prosecuting Attorney; Courts;
 Bonding Practices

Communication Skills 8 hours

\* Pre-Promotional Training 16 hours

\*\* Basic Supervision 16 hours

 \* Optional Courses

\*\* Required for Supervisory personnel

## TRAINING COORDINATOR

### GENERAL STATEMENT OF DUTIES:

Designs, develops, conducts and evaluates Departmental training program. Arranges, coordinates and maintains the resources necessary for the training program. Assists upper level management in establish personnel policies regarding training.

### DISTINGUISHING FEATURES OF THIS CLASS:

This is staff work of a responsible nature. Work is performed through both general and specific delegation by supervisor. Considerable emphasis placed upon imaginative use of available training resources and development of course curriculum.

EXAMPLES OF WORK:

— Select/determine learning methodology.
— Identify pre and post training performance levels.
— Determine need for training resources, identify potential outside resources, and establish criteria for technical competence.
— Develop selection criteria for participants, assess and assist in selection of participants.
— Conduct formal training courses.
— Arrange for training facilities; procure equipment, supplies and materials.
— Coordinate training schedules, assignments, space, materials and resources.
— Counsel employees regarding training and developmental opportunities.
— Explain training policies and procedures to supervisors and employees.
— Assist management in analyzing performance problems.
— Initiate and follow-up on personnel actions having to do with the training operation.

REQUIRED KNOWLEDGE, SKILLS AND ABILITIES:

Must be able to develop work objectives, able to write definitive traning program design plans, able to write instructive training materials, able to organize written materials, able to take initiative, ability to be effective in one to one and group situations. Must have understanding of the organization's detention function and its supporting administration, oral and written communications competence, understanding of group dynamics, speaking ability. Must be able to conduct classroom training.

ACCEPTABLE EXPERIENCE OR TRAINING:

Bachelor's Degree in Management, Personnel, Education or Criminal Justice. 1–2 yrs. training experience required. Institutional experience desirable but not mandatory.

---

MEMORANDUM OF AGREEMENT
GOLDSBY vs. CARNES 3/10/77
EXHIBIT C; PART III, NO. 10e
FOOD CARTS

The Department of Corrections began testing and evaluation of alternative methods of transporting and serving food in order to maintain it at proper serving temperatures until all inmates have been fed.

We've begun utilizing Temptainers, an insulated carrier designed for food service, for one living area.

We have also modified one of our existing food carts to contain heating devices to serve another living unit.

At the present time, the position of Food Service Director is vacant. Recruitment is currently underway. No final decision regarding the method to be adopted will be made until the new Food Service Director has had a maximum of two months to evaluate the effectiveness and benefits of the alternatives. Final decision to be made by June 15, 1977.

MEMORANDUM OF AGREEMENT
GOLDSBY vs. CARNES 4/1/77
EXHIBIT D; PART I, NO. 3—
MATTRESSES

The Department of Corrections shall purchase contour elastic style plastic mattress

covers to be tested during the period of 5/1/77–6/15/77. During this period these covers will be tested for durability, ease with which they can be cleaned/sanitized, and comfort.

If the covers are found to be acceptable, based on the above criteria, a sufficient quantity will be purchased to comply with the following:

Each inmate, upon admittance to the Department of Corrections, will be issued either a mattress with a sanitized plastic coated sewn-on cover or a mattress with a sanitized contour plastic cover. As an inmate is moved from one living area of the jail to another, his personal belongings, including his mattress, will be taken with him.

If the contour covers are found to be unacceptable, a sufficient quantity of new plastic coated mattresses will be purchased to supply each new admittant with a clean mattress which will remain with him throughout his confinement.